UNITED STATES

v.

Sergeant Darryl R. BOULDEN, FR 219–60–1842, United States Air Force.

ACM 26638.

U.S. Air Force Court of Military Review.

Sentence Adjudged 15 Dec. 1987.

Decided 10 June 1988.

Appellate Counsel for the Appellant: Colonel Leo L. Sergi and Major Frank J. Spinner.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni, Lieutenant Colonel Morris A. Tanner, Jr., Captain Marc Van Nuys, Lieutenant Colonel Barret E. Kean, USAFR and Major Scott W. Stucky, USAFR.

Before LEWIS, MICHALSKI and BLOMMERS, Appellate Military Judges.

## DECISION

LEWIS, Senior Judge:

This is a urinalysis case. Despite his plea of not guilty the appellant was found guilty by members of the wrongful use of cocaine. His sentence as adjudged and subsequently approved consists of a bad conduct discharge, confinement for one year, forfeiture of all pay and allowances and reduction to airman basic.

The essential facts are summarized herein. The appellant was required to provide a sample of urine pursuant to a unit inspection. Mil.R.Evid. 313(b). The inspection was conducted shortly after his return to duty following a weekend of recreation with two fellow members in Amsterdam. The urine, after being screened and determined to be presumptive positive for the cocaine metabolite, was subjected to the gas chromatography/mass spectrometry (GC/MS) test at the Army's central drug laboratory in Europe. Through this testing the cocaine metabolite, benzoylecgonine, was detected at a level of between 230 and 270 nanograms per milliliter (ng/ml) of urine. This was in excess of the minimum level for a positive test result, 150 ng/ml. The parties stipulated to the facts reflecting an adequate chain of custody of the appellant's urine sample from the point of collection through the laboratory screening and testing processes. Thus, the aforementioned test data, supplemented by the testimony of an expert witness, constituted the prosecution evidence.

The appellant testified on the merits and denied having knowingly used cocaine. His two companions in Amsterdam also provided testimony in which they accounted for most of the appellant's activities during their stay there except for one evening when the appellant was in the company of a newly found female acquaintance for several hours. While the witnesses acknowledged that they had engaged in a good deal of party activity involving consumption of alcohol, they denied having noted any drug activity or other suspicious acts resembling drug ingestion by the appellant.

Appellate defense counsel in their assignment of errors contend that the evidence is not sufficient to support the finding of guilty. Among the reasons assigned in support of this conclusion is that the government urinalysis expert's testimony failed to demonstrate cocaine ingestion in that he did not testify that benzoylecgonine is not naturally produced by the body or by any other substance except cocaine, citing *United States v. Murphy*, 23 M.J. 310 (C.M.A.1987); *United States v. Harper*, 22 M.J. 157 (C.M.A.1986). We specified for further discussion the issue of whether, in view of the aforementioned omission, the prosecution evidence was sufficient to es-

tablish the first element of the offense, that the appellant used cocaine. M.C.M., Part IV, paragraph 37b(2)(a) (1984). We are persuaded by the analysis of this issue by appellate government counsel that the evidence is sufficient to establish the appellant's use of cocaine in the circumstances of this case.

In this case, unlike most urinalysis cases we have reviewed, the written data concerning the test results were not proffered nor admitted into evidence. That, in and of itself, causes us no concern. It is not the written urinalysis data product which is of paramount value to factfinders. Often such data product is quite voluminous, very technical, and more than a little bit confusing to one not familiar with laboratory testing methodology. Such a body of data, standing by itself, is of little value to the lay person. As the Court of Military Appeals has noted, a urinalysis data product "needs in-court expert testimony to assist the trier of fact in interpreting it if it is to rationally prove that an accused used marijuana" or other controlled substances. *United States v. Murphy, supra,* 23 M.J., at 312.

At trial the government expert, Major Michael L. Smith, Commander, Army Drug Testing Laboratory, Wiesbaden, Germany, testified concerning the urinalysis results. He explained that the screening and GC/MS confirmation test procedures detect the presence of benzoylecgonine, which he described as "a metabolite of cocaine." Subsequently, he provided a slightly more detailed explanation, as follows:

Specifically in the case of cocaine, if a person insufflates it, takes is through their nose or ingests it in some manner, the body rapidly absorbs that. It starts circulating through the system. The liver and various other enzymes in the body convert the cocaine into a bunch of different metabolites, the principle [sic] one being benzoylecgonine in this case, which comes out in the urine. We then measure that to infer that the person has ingested cocaine, that result.

Major Smith, possibly through oversight by the trial counsel, was not specifically queried at any point in his testimony whether the metabolite, benzoylecgonine, is unique to cocaine or whether it might be naturally produced by the body or by some other substance ingested into the body. However, he expressed his certainty that the GC/MS result reflected that the appellant's urine was "positive for cocaine." He opined that the 230–270 ng/ml of benzoylecgonine detected in the appellant's urine sample was consistent with a use of cocaine during the two to three day period before the urine was collected.

At first glance the absence of an opinion by the expert as to a unique relationship between the suspected drug and the detected metabolite might appear fatal to the prosecution case. In *United States v. Harper, supra,* 22 M.J., at 161, Judge Cox noted:

The mere presence of the drug or its constituent elements in the body has not been expressly held by this Court to be a fact sufficient to show use of that drug. Instead, we have additionally relied on expert testimony that the chemical traces of the drug are not naturally produced by the body or any other substance except the drug in question. *United States v. Wynn,* [11 U.S.C.M.A. 195, 29 C.M.R. 11 (1960)], and *United States v. Ford,* [4 U.S.C.M.A. 611, 16 C.M.R. 185 (1954)].

This principle was re-enunciated by Judge Sullivan, writing for the Court in *United States v. Murphy, supra. Murphy* was a marijuana urinalysis case in which the prosecution had relied upon laboratory results alone to establish use of the substance. In analyzing the deficiencies of such evidence, Judge Sullivan noted that

... there was no basis in the record of trial for the judge to rationally conclude that [the metabolite of marijuana] was not naturally produced by the accused's body or as a result of some other substance consumed by him. [Citation omitted.] Accordingly, the record of trial does not support appellant's conviction for the wrongful use of marijuana.

23 M.J., at 311–312.

Thus, the Court of Military Appeals has established guidance on the nature of ex-

pert testimony to be elicited if a legally sustainable urinalysis is to be achieved. *See* Mil.R.Evid. 703 and 705 for the general treatment of evidence of the underlying bases for expert opinions. Having reviewed a number of contested urinalysis cases, we have observed that the previously cited *Harper/Murphy* guidance is being followed with precision by Air Force trial counsel. This case appears to represent the rare exception. Is the guidance so ironclad that a deviation mandates reversal? In this case, we believe not.

■ Before we state those factors we rely upon in affirming the finding of guilty in this case, perhaps it is equally important to note that upon which we do not rely. Every contested urinalysis case involves an inevitable "re-invention of the wheel" in terms of the basic scientific testimony which is elicited, particularly for those participants who have been involved in a number of such trials. It is, nonetheless, a well established tenet of practice that a factfinder cannot rely upon information received in a prior trial in resolving an issue before him or her in the trial at hand. *United States v. Barnes*, 12 M.J. 956 (A.F. C.M.R.1982). This is not to suggest, of course, that triers of fact "have to be completely isolated from their previous background and experience. Thus, they may in an appropriate case bring *commonly-known* facts with them" into deliberations. *United States v. Witherspoon*, 12 M.J. 588, 590 (A.C.M.R.1981), *aff'd*, 16 M.J. 252 (1983) (emphasis added). However, a factfinder cannot attempt to rely upon specialized knowledge or expertise beyond that commonly acquired by persons generally in arriving at a determination material to guilt or innocence. *United States v. Conley*, 4 M.J. 327 (C.M.A.1978) (military judge used his self-proclaimed expertise as a questioned documents examiner to assist him in resolving a disputed factual issue).

■ Admittedly, it can be exceedingly difficult to distinguish between that knowledge which is commonly acquired from that which represents an area of special expertise. However, insofar as urinalysis information is concerned, there seems little

doubt that the *Conley* rule applies, for the present at least. The *Murphy* court was not persuaded that the scientific principles of urinalysis were matters of "common sense" or of "knowledge of human nature." 23 M.J., at 311. Therefore, the Court, citing *Conley*, stated: "In summary, where scientific evidence is relied upon to prove the use of marihuana, the Government may not presume that the judge or members are experts capable of interpreting such evidence." *Id.*, at 312. Therefore, we cannot presume that the members, or some of them, were surely aware that GC/MS confirmation testing seeks to isolate a metabolite unique to cocaine. For the purpose of our analysis that which the members were not told, either expressly or implicitly, by the expert witness, Major Smith, they did not know.

■ In this case the defense strategy at trial was to attack the second element of the charged offense, the wrongfulness of the alleged use. M.C.M., Part IV, paragraph 37b(2)(b) (1984). The members were aware of the defense approach prior to hearing any testimony. The defense counsel clearly indicated in his opening statement that it was the second element of wrongfulness, rather than the fact of ingestion of cocaine, which would be the focal issue. During the cross-examination of Major Smith, the defense counsel's questions were patently designed to support a theory of innocent ingestion by the appellant. The defense closing argument illustrated the defense strategy even more graphically. A fair summary, from our vantage point, is that the scientific proof of cocaine ingestion was virtually conceded. Counsel stated, "The issue in this case is whether he knowingly used cocaine." From that premise it was argued that the prosecution had failed to establish that the appellant had knowingly and, thus, wrongfully ingested cocaine. Just prior to closing his remarks, defense counsel summarized, as follows: "But remember what the issue is: Did you know you used cocaine? Did you use cocaine intentionally? No. Never shaken. Not one shread [sic] of evidence to the contrary."

While the prosecution was not relieved of its burden of proof as to both elements, the triers of fact were consistently invited by the defense to focus their attention on the second element, the wrongfulness of the use. *See United States v. Ford*, 23 M.J. 331 (C.M.A.1987); *United States v. Harper, supra; United States v. Bassano*, 23 M.J. 661 (A.F.C.M.R.1986), *pet. denied*, 25 M.J. 219 (1987), for discussions of the application of the permissive inference of wrongfulness. Thus, the members were clearly placed on notice, both before and after the fact, that Major Smith's expert testimony, while clearly important, would probably not be critical to their resolution of the real factual issue in dispute.

It is also important, as appellate government counsel urge, that we closely examine the full substance of Major Smith's testimony. The three primary points that relate most directly to the issue before us have already been summarized. First, benzoylecgonine is a metabolite of cocaine, in fact, the principal metabolite of that particular controlled substance. Secondly, the presence of benzoylecgonine in the appellant's urine sample at the 230–270 ng/ml level indicated was consistent with the use of cocaine during the two to three day period prior to the date on which the appellant provided the sample. Thirdly, based on the GC/MS test result, the sample was considered to be positive for cocaine. While it was not expressly asked nor stated, implicit in Major Smith's replies is the inescapable premise of a distinctive relationship between cocaine and the metabolite which was isolated and measured. How else could the witness possibly opine with any degree of certainty that the GC/MS testing revealed a positive cocaine result?

While the key question suggested by *Harper* and *Murphy* was not asked, its answer was implicit if one considers the breadth of Major Smith's responses to the questions posed. The members had a sufficient basis from the full scope of the expert's testimony "to rationally conclude that ... [benzoylecgonine] was not naturally produced by the accused's body or as a result of some other substance consumed by him." *United States v. Murphy, su-*

*pra*, 23 M.J., at 312. Therefore, we conclude that the evidence at trial was sufficient to support the members' finding of guilty. Based upon our independent review of the record we are also convinced beyond a reasonable doubt of the appellant's guilt. Article 66(c), U.C.M.J., 10 U.S.C. § 866(c).

The findings of guilty and the sentence are correct in law and fact and, on the basis of the entire record, are

AFFIRMED.

Judges MICHALSKI and BLOMMERS concur.