44

UNITED STATES, Appellee,

v.

Darryl R. BOULDEN, Sergeant, U.S. Air Force, Appellant.

No. 60,866.
ACM 26638.

United States Court of Military Appeals.

Sept. 26, 1989.

For Appellant: *Major Frank J. Spinner* (argued); *Colonel Richard F. O'Hair* (on brief).

For Appellee: *Captain Morris D. Davis,* Jr. (argued); *Colonel Joe R. Lamport* and *Lieutenant Colonel Robert E. Giovagnoni* (on brief).

*Opinion of the Court*

SULLIVAN, Judge:

On December 14 and 15, 1987, appellant was tried by general court-martial with members at Hahn Air Base, Federal Republic of Germany. Contrary to his pleas, he was found guilty of wrongful use of cocaine, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. He was sentenced to a bad-conduct discharge, confinement for 1 year, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence as adjudged. The Court of Military Review affirmed the findings and sentence. 26 MJ 783 (1988).

This Court granted review of the following issue:

WHETHER THE EVIDENCE IS INSUFFICIENT, AS A MATTER OF LAW, TO PROVE GUILT WHERE THE GOVERNMENT DID NOT ESTABLISH THAT BENZOYLECGONINE IS A METABOLITE UNIQUE TO COCAINE.

We hold that the evidence presented in this case was sufficient for a rational trier of fact to find appellant guilty beyond a reasonable doubt of using cocaine. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Murphy,* 23 MJ 310 (CMA 1987).

The necessary facts of this case were found by the Court of Military Review as follows:

The appellant was required to provide a sample of urine pursuant to a unit inspection. Mil. R. Evid. 313(b). The inspection was conducted shortly after his return to duty following a weekend of recreation with two fellow members in Amsterdam. The urine, after being screened and determined to be presumptive positive for the cocaine metabolite, was subjected to the gas chromatography/mass spectrometry (GC/MS) test at the Army's central drug laboratory in Europe. Through this testing the cocaine metabolite, benzoylecgonine, was detected at a level of between 230 and 270 nanograms per milliliter (ng/ml) of

urine. This was in excess of the minimum level for a positive test result, 150 ng/ml. The parties stipulated to the facts reflecting an adequate chain of custody of the appellant's urine sample from the point of collection through the laboratory screening and testing processes. Thus, the aforementioned test data, supplemented by the testimony of an expert witness, constituted the prosecution evidence.

The appellant testified on the merits and denied having knowingly used cocaine. His two companions in Amsterdam also provided testimony in which they accounted for most of the appellant's activities during their stay there except for one evening when the appellant was in the company of a newly found female acquaintance for several hours. While the witnesses acknowledged that they engaged in a good deal of party activity involving consumption of alcohol, they denied having noted any drug activity or other suspicious acts resembling drug ingestion by the appellant.

Appellate defense counsel in their assignment of errors contend that the evidence is not sufficient to support the finding of guilty. *Among the reasons assigned in support of this conclusion is that the government urinalysis expert's testimony failed to demonstrate cocaine ingestion in that he did not testify that benzoylecgonine is not naturally produced by the body or by any other substance except cocaine ...*

26 MJ at 784 (emphasis added).

-------

In *United States v. Harper*, 22 MJ 157, 161 (CMA 1986), this Court said:

The mere presence of the drug or its constituent elements in the body has not been expressly held by this Court to be a fact sufficient to show use of that drug. Instead, we have additionally relied on expert testimony that the chemical traces of the drug are not naturally produced by the body or any other substance except the drug in question.

In *United States v. Murphy, supra,* this Court set aside findings of guilty for wrongful use of drugs where no expert testimony was provided to explain the laboratory results of urinalysis to the factfinder. We said:

First, there was no satisfactory basis in the record of trial for the judge to rationally conclude that [tetrahydrocannabinol] THC had any relationship to the prohibited substance, marijuana. Second, there was no basis in the record of trial for the judge to rationally conclude that THC was not naturally produced by the accused's body or as a result of some other substance consumed by him.

*Id.* at 311–12 (citations omitted). Appellant asserts today that, although an expert witness did testify in this case, his testimony falls far short of that required by the above decisions. We disagree.

We note at the outset that the government expert, Major Smith, did not utilize the precise words articulated in *United States v. Harper* and *United States v. Murphy,* both *supra.* However, appellant's suggestion that the government expert's testimony was so deficient as to be equated with his "mere presence" is obvious hyperbole. The following exchange between trial counsel and Major Smith occurred in the record:

Q. All right. Let's back up a bit. Could you tell us a little bit about the radioimmunoassay as best you can in layman terms and how *that particular test works to identify cocaine?*

A. Yes. The basic principle uses an antibody which essentially looks at a particular structure, a molecule, and identifies it, much like the antibodies do in our body that pick out certain diseases and get rid of them.

In this particular case, a purified antibody against a *metabolite of cocaine called benzoylecgonine, which is actually the substance we measure,* is used. And to try to simplify the test, this antibody is mixed with a radioactively labeled benzoylecgonine mole-

cule, and those two substances are combined, with the antibody actually grabbing on to the benzoylecgonine molecule like a lock and key, or mixed with urine. *If there's some benzoylecgonine present in the urine, or the cocaine metabolite, it displaces some of that radioactive tracer.*

We then take these complexes of antibody and bound tracer count them. So if the count goes down, we know there's some benzoylecgonine in the urine. If it doesn't change what we expect, we know that it's a negative urine. There's nothing there to displace the tracer.

Q. So if the radioactive level is reduced, that means that there is some metabolite in the urine competing with the labeled benzoylecgonine. Is that correct?

A. That's correct.

Q. Could you tell us a little bit about what a metabolite is and how it comes about?

A. Yes. If a person ingests a drug, the body tries to get rid of it, and one way it does that is to make it more soluble and it eventually comes out in the urine. That's why we test urine, to look for these metabolites.

Specifically in the case of cocaine, if a person insufflates it, takes it through their nose or ingests it in some manner, the body rapidly absorbs that. It starts circulating through the system. The liver and various other enzymes in the body convert the cocaine into a bunch of different metabolites, *the principle one being benzoylecgonine in this case, which comes out in the urine. We then measure that to infer that the person has ingested cocaine, that result.*

(Emphasis added.) Later, it was said:

Q. Could you tell us what were the results of the mass spec in this case?

A. It was positive.

Q. Could you tell us how the mass spec works and identifies the compound?

A. Yes. What we first have to do is get the metabolite out of the urine. You put it into some kind of substance that's compatible with the GC mass spec, and to do that we go through an extraction procedure. That eliminates a number of molecules that are similar to benzoylecgonine. At this point we inject them into the gas chromatogram where they are heated and they travel through a long, narrow tube and, in doing that, they interact with the material that's placed inside of that tube and separates molecules into groups. In one particular group of molecules, it will insert chemical properties that come out of the tube, let's say, five minutes later; others will come out 5.1 minutes later and some others will come out 6 minutes later. So by looking at that particular retention time in the tube, we eliminate another group of molecules and, at that point, those little group[s] of molecules which are usually not a very pure state—they're almost all benzoylecgonine molecules—go into the mass spectrometer.

The mass spectrometer actually impacts the molecules with electrons. It shatters the molecules and breaks them into little pieces. It then identifies those pieces by weight and tells us how much of each piece is there. *By looking at that kind of molecular fingerprint, we can identify the molecule.*

Q. When you looked at the particular test results in this case by mass spec and compared it with a known positive, what did you come up with?

A. *We identified the substance as benzoylecgonine* and we quantitated it at about 270 nanograms per milliliter by mass spec—between 230 and 270 nanograms per milliliter.

Q. Could you tell us why the numbers by the mass spec are different than the numbers by the RIA?

A.  The radioimmunoassay looks at molecules that are very similar to benzoylecgonine and there are a couple of other metabolites that are very similar.

Q.  That are produced from cocaine?

A.  Produced from cocaine. *GC mass spec is very specific about the molecules it looks at, and it looks at only [the] benzoylecgonine molecule itself, so we expect its value to be a little* lower, and that's why DOD has set the cutoff lower also now, and it's at 150 nanograms per milliliter.

Q.  To be positive by mass spec, at 150 nanograms.

A.  That's right.

Q.  Have you reviewed the data in this case, both RIA test and the mass spec?

A.  Yes, I have.

Q.  Any doubt in your mind, sir, that this urine was positive for cocaine?

A.  I'm sorry?

Q.  *Any doubt in your mind as to whether or not this urine was positive for cocaine?*

A.  *I'm positive.*

This expert testimony established several facts which would permit the laboratory results in this case to be rationally relied on to show appellant used cocaine. First, the expert made it clear that these tests and their results were accomplished for the express purpose of determining cocaine use. Second, benzoylecgonine was identified as the principal metabolite of cocaine such that the determination of its presence was the object of these two scientific tests. Third, benzoylecgonine was characterized as having a unique molecular structure (*i.e.* a "molecular fingerprint") which was discovered in this case and which led the expert to conclude appellant's urine sample was positive for cocaine. We agree with the Court of Military Review that this testimony as a whole reasonably implies that the presence of the benzoylecgonine metabolite in urine is a proper basis upon which to identify cocaine use. Our stated preference for more precise expert testimony as delineated in *Harper* and *Murphy* does not dictate reversal in this case.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge EVERETT and Judge COX concur.