UNITED STATES, Appellee,

v.

Christopher W. CAMPBELL,
Private First Class, U.S.
Army, Appellant.

No. 97–0149.
Crim.App. No. 9400527.

U.S. Court of Appeals for
the Armed Forces.

Argued Dec. 4, 1997.

Reargued June 4, 1998.

Decided April 20, 1999.

Sullivan and Crawford, JJ., filed dissenting opinions.

EFFRON, J., delivered the opinion of the Court, in which COX, C.J., and GIERKE, J., joined. SULLIVAN and CRAWFORD, JJ., filed dissenting opinions.

For Appellant: *Captain T. Michael Guiffre* (argued and reargued); *Colonel John T. Phelps, II, Major Holly S.G. Coffey, Major Michael E. Hatch,* and *Major Leslie A. Nepper* (on briefs); *Lieutenant Colonel Michael L. Walters* and *Captain Stephen P. Bell, Jr.*

For Appellee: *Captain Chris A. Wendelbo* (argued and reargued); *Colonel Joseph E. Ross* and *Lieutenant Colonel Frederic L. Borch, III* (on briefs); *Major Virginia G. Beckes.*

Judge EFFRON delivered the opinion of the Court.

A special court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of wrongful use of lysergic acid diethylamide (LSD), in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. The members sentenced appellant to a bad-conduct discharge, confinement for 75 days, forfeiture of $549.00 pay per month for 2 months, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Criminal Appeals affirmed.

On appellant's petition, we granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED IN ADMITTING THE URINALYSIS TEST RESULTS AND THE GOVERNMENT'S EXPERT OPINION TESTIMONY REGARDING THE TEST ABSENT A SHOWING THAT THE NOVEL LSD TESTING METHODOLOGY WAS SUFFICIENTLY RELIABLE.

After oral argument in December 1997, the Court specified the following related issues:

I

WHETHER THE CONSTITUTION, THE MANUAL FOR COURTS-MARTIAL, REGULATIONS, OR OTHER APPLICABLE LAW REQUIRE A PARTICULAR CUT-OFF LEVEL IN ORDER FOR THE PROSECUTION TO ESTABLISH BEYOND A REASONABLE DOUBT APPELLANT'S KNOWING USE OF LSD.

II

WHETHER THE RECORD OF TRIAL CONTAINS SUFFICIENT SCIENTIFIC EVIDENCE REGARDING THE BASIS FOR THE CUT-OFF LEVEL FOR REPORTING POSITIVE GC/MS/MS TEST RESULTS (200 PG/ML) SUCH THAT THE MEMBERS COULD DRAW AN INFERENCE OF WRONGFULNESS OF THE USE FROM THE CONCENTRATION OF LSD REPORTED IN APPELLANT'S SAMPLE (307 PG/ML). *SEE UNITED STATES V. THOMPSON,* 34 MJ 287 (CMA 1992); *UNITED STATES V. HARPER,* 22 MJ 157 (CMA 1986).

III

WHETHER THE EXPERT TESTIMONY REGARDING THE RESULTS OF THE CERTIFICATION AND BLIND AND OPEN QUALITY CONTROL TESTING WAS SUFFICIENT TO DEMONSTRATE THE RELIABILITY OF THE TESTING PROCEDURE UNDER *DAUBERT* TO REASONABLY EXCLUDE THE POSSIBILITY OF A FALSE POSITIVE RESULT.

A. WHAT EVIDENCE, IF ANY, INTRODUCED AT TRIAL DEMONSTRATES THAT GC/MS/MS WAS SUFFICIENTLY RELIABLE WITH REGARD TO REPORTING RESULTS AS POSITIVE OR NEGATIVE AND WITH REGARD TO PRECISELY IDENTIFYING THE EXACT CONCENTRATION OF LSD IN URINE.

B. WHAT WAS THE SIGNIFICANCE, IN TERMS OF ESTABLISHING THE RELIABILITY OF GC/MS/MS, OF EACH OF THE FOLLOWING STATEMENTS ABOUT THE TEST RESULTS:

1. THAT THE ARMY CONCLUDED THE GC/MS/MS METHODOLOGY WAS "VERY ACCURATE" (R. 151);

2. THAT NORTHWEST TOXICOLOGY LABORATORY (NTL) HAS ALWAYS BEEN "WITHIN PLUS OR MINUS 20 PERCENT OR 2 STAN-

DARD DEVIATIONS OF THE MEAN" WHEN ITS RESULTS ARE COMPARED TO THE TWO NAVY LABS CONDUCTING LSD CONFIRMATION TESTING (R. 188); AND

3. THAT NTL HAS NEVER INCORRECTLY REPORTED A BLIND QUALITY CONTROL RESULT, I.E., THAT NTL HAS NEVER INCORRECTLY REPORTED A RESULT AS POSITIVE OR NEGATIVE WHEN IT TESTS FOR THE PRESENCE OF LSD (AS OPPOSED TO QUANTIFYING THE CONCENTRATION OF THE DRUG) (R. 187).

For the reasons discussed below, we reverse the decision of the Court of Criminal Appeals.

## FACTS

As noted by the court below, the sole evidence pertaining to the charge of wrongful use of LSD in this case consisted of the report of results of a urinalysis test. At trial, defense counsel moved to exclude evidence of the urinalysis and the supporting expert testimony on the ground that the scientific methodology used in the confirmatory test—gas chromatography tandem mass spectrometry (GC/MS/MS)—did not meet the standards of reliability required by Mil. R.Evid. 702, Manual for Courts–Martial, United States (1995 ed.), and relevant case law. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *United States v. Nimmer*, 43 MJ 252 (1995). Consideration of the motion, which was contested, involved testimony from three expert witnesses.

The military judge denied the defense motion. Subsequently, he documented his decision in an appellate exhibit headed "Court Findings of Fact, Conclusions of Law, and Ruling on the Defense Motion *In Limine*."

The evidence at issue was obtained during a routine unit inspection in which members of appellant's unit were required to produce urine samples. This was not prompted by any concern about appellant's duty performance or behavior.

Appellant's sample was sent to the Army's drug testing laboratory at Fort Meade, Maryland. It was tested twice over a 4–day period using radioimmunoassay analysis (RIA) for LSD. Both tests indicated that appellant's urine contained LSD. The RIA procedure, however, does not quantify the amount of the drug in a sample and has not been certified by the Department of Defense as reliable for prosecution under the Uniform Code of Military Justice.

After the RIA test results were obtained, the sample was sent to Northwest Toxicology Laboratory (NTL) in Salt Lake City, Utah, for additional testing. At NTL, appellant's sample was examined through a test using GC/MS/MS methodology. That test showed a level of 307 picograms (one-trillionth of a gram) of LSD per milliliter of urine. The Department of Defense has established a cutoff level of 200 picograms.

Dr. Rodger Foltz, the Laboratory Director of NTL, testified on behalf of the prosecution. He stated that the GC/MS/MS test is "based on scientific principles ... accepted by the scientific community" and represents the "state of the art" in testing for drugs. He stated that there are "a few" other toxicology laboratories that use that same test, but he added that its use is not widespread because the testing instrument costs about $350,000. He stated that this method of testing had been "presented at conferences on at least two occasions by two fellow toxicologists," where it was subject to peer review. Dr. Foltz also testified that he had published an article in a peer-reviewed journal, *Analytical Chemistry*, in 1992 on the GC/MS/MS testing employed at NTL. He testified that there were no other articles on this method, because the "normal practice" is for scientists to publish an article only when there is a problem. He pointed out that this method had been published "in the open literature," so "any other lab with that instrumentation is certainly free to use it." He acknowledged, though, that he was "not aware, at this time, of any other labs actually using it."

With respect to quality control, he testified that NTL received 20 "open quality-control

samples" per month to ensure the accuracy of its testing. These samples were presented for analysis, and the laboratory did not know what drug, if any, was present or in what level of concentration. These samples had been received since January 1993, when the laboratory first entered into a contractual agreement with the Army.

Dr. Foltz testified that, prior to awarding them a contract, the Armed Forces Institute of Pathology (AFIP) had conducted an "extensive review" of the procedures used at NTL to make sure the methodology was reliable. After NTL had been given a number of samples and had passed the quality control of AFIP, the Army had concluded that NTL's methodology for detecting LSD was "very accurate." Moreover, 15 blind quality-control samples were returned by NTL to AFIP over the period of several months between getting the Army contract and receiving appellant's sample, all of which were tested correctly. Additionally, AFIP sent 10 "open quality controls" per month to NTL, and the past results of these tests fell within the standard deviation permitted for quality control. These open quality-control tests also were compared with two Navy laboratories that performed urine testing for LSD, but with a different methodology, and no significant statistical deviation was found between their results and NTL's findings.

Dr. Arthur J. McBay, a retired state forensic toxicologist, testified for the defense. He stated that, although GC/MS/MS had been accepted in the scientific community for uses such as hair analysis, it had not been accepted as a method of testing for drugs. Concerning the RIA test, Dr. McBay indicated that it was "a reliable means to screen for LSD."

Dr. McBay testified that he was familiar with the publications *Analytical Chemistry* and the *Journal of Analytical Chemistry* and, as a scientific peer, had reviewed articles for the former, as well as for other journals. He testified that there was a distinction between acceptance of a paper for publication, on the one hand, and acceptance by the scientific community of the methodology described in such a paper, on the other.

Asked whether "publication of a single article—like the one that [he was] asked about by the prosecution—constitutes peer review of a scientific methodology[,]" Dr. McBay responded: "Well, it's peer review of that particular presentation of that article—that's all." He added: "[N]ow, if you give me 100 papers that are accepted on that particular topic, that would be a different matter or a dozen or something else, but you've got one" on the GC/MS/MS methodology.

Dr. McBay testified that true peer review would include the same methodology being employed by more than one laboratory. "But one is at a loss if, indeed, only one laboratory could do something and there's no other laboratory that you could use to check the results with another sample, for instance." He acknowledged that the GC/MS/MS methodology used at NTL would tend to produce valid results if more than one laboratory within the Department of Defense conducted tests of urine for LSD using different methodologies but obtained results similar to NTL on open quality-control samples.

Dr. Robert K. Simon, owner of Toxicology International, also testified for the defense. Dr. Simon testified as to GC/MS/MS procedure, as follows:

[G]as chromatography tandem mass spectrometer procedure ... combine[s] a gas chromatograph with essentially two mass spectrometers so that instead of having one mass spectrometer to try to identify a particular drug substance, a rather unique system has been established to combine two mass spectrometers together to give us some additional data that can hopefully be used for drug identification.

He added:

The difficulty in analyzing for this particular substance in urine, blood or any other biological fluid or even in a piece of—a tab of LSD paper is that the amount is extremely small. The dose that one takes of LSD is somewhere between perhaps 70 and 100 micrograms, that is 70 to 100 one-millionth of a gram, so it is a very small quantity. That then, diluted into the body can then possibly emerge into urine over a

period of hours after use in concentrations that are in picograms and that really is a unit that is one thousand lower than the normal drug substances appear which is nanograms, so we're at ten-to-the-minus-twelfth range of concentration of this drug per milliliter of urine.

Dr. Simon pointed out that the equipment used at Northwest Toxicology was the only such equipment in the country and that the methodology of that equipment had not been accepted in the scientific community. He explained that with essentially only one functional unit in the country—the one at NTL—"there would be no way to have a scientific peer evaluation of either the technique or this particular method at this time." He stated: "This is a very novel technique, a novel piece of equipment and a very novel methodology." He also testified that the reliability of NTL's results from GC/MS/MS could be shown by the use of open control tests confirmed by two other laboratories employing different methodologies.

The judge then asked the following question for a member:

Q. Dr. Simon, I have this question for you. Based upon your experience gained from working drug testing for DoD, if GC/MS/MS is in experimental stages, why would DoD contract Northwest to conduct drug confirmation?

A. I think the answer to that question is, there is certainly a compelling interest in determining LSD in urine. Certainly the statistics in and outside of DoD tell us that LSD use has re-emerged in the late '80's and early '90's as a drug of choice among individuals, so there is a great interest in being able to develop this method. And certainly, Dr. Foltz is well recognized in the field of forensic toxicology and scientific research as a person highly capable to do this work. So I certainly think the interest is there and I think the reason DoD would contract with him is, he's a prime individual who has been involved in this type of research for many years.

That's why they would actually contract with him.

Later, Dr. Simon was recalled. He testified that, because of the unusual peaks on the test, he would "disqualify th[e] entire batch," including the results pertaining to appellant. He explained in detail how the court members should examine these peaks and determine the reliability of the test for LSD.

Dr. Foltz also was recalled. He testified that the "commercial version" of the GC/MS/MS instrument was introduced in 1979 and that there were more than 300 such "instruments in operation around the world," most of them being "used in the pharmaceutical industry for analysis of various drugs undergoing development in biological specimens, including blood and urine." He added that, to his knowledge, NTL was the only laboratory "currently using GC/MS/MS for confirmation of LSD in urine." He also stated that any issue concerning the absence of testing in universities was probably a reflection of the high cost of the equipment. The defense expert, Dr. McBay, also stated that the equipment was not available in many laboratories because of its expense.

## DISCUSSION

### A

The armed forces have a compelling interest in addressing the corrosive impact of drug abuse on the readiness of the armed forces to engage in combat. The Supreme Court has emphasized that "it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise." *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 17, 76 S.Ct. 1, 100 L.Ed. 8 (1955). Congress, in Article 112a of the Uniform Code of Military Justice, has authorized court-martial proceedings against any servicemember who "wrongfully uses" controlled substances or commits a variety of other offenses involving illegal drugs.

To obtain a conviction under Article 112a, the prosecution must introduce sufficient evidence to convince a reasonable factfinder, beyond a reasonable doubt:

(a) That the accused used a controlled substance; and

(b) That the use by the accused was wrongful.

Para. 37b(2), Part IV, Manual, *supra.* Often, the prosecution may be able to prove wrongful drug use through an admission by the accused or observations by witnesses capable of identifying use of a controlled substance, particularly in terms of the effect on the behavior of the accused.

In some cases, however, the prosecution has no direct evidence of use and no circumstantial evidence in the form of any effect on the conduct of the accused. The only evidence in such cases may be the results of a drug test that identifies the presence of the drug or a metabolite in the accused's body fluids.

In the Manual for Courts–Martial, the President has recognized our case law providing that proof of drug use requires proof of knowledge:

Knowledge of the presence of the controlled substance is a required component of use. Knowledge of the presence of the controlled substance may be inferred from the presence of the controlled substance in the accused's body or from other circumstantial evidence. This permissive inference may be legally sufficient to satisfy the government's burden of proof as to knowledge.

Para. 37c(10), Part IV.[1] To satisfy the second element of the offense—that the use was "wrongful"—the President has made clear that the use must be "without legal justification or authorization." The Manual provides that use "may be inferred to be wrongful in the absence of evidence to the contrary." Para. 37c(5).

Our Court has considered these inferences in the context of our longstanding recognition that the serious threat to military readiness posed by drug abuse permits use of evidence-gathering techniques that would not necessarily pass muster in a civilian context. *See, e.g., United States v. Jackson,* 48 MJ 292

(1998); *Murray v. Haldeman,* 16 MJ 74, 78 (1983); *United States v. Middleton,* 10 MJ 123 (1981); *United States v. Trottier,* 9 MJ 337, 345–46 (1980). In *United States v. Bickel,* 30 MJ 277 (1990), a case upholding use of urinalysis test results in court-martial proceedings, we noted that such use is in contrast to the Supreme Court's approach to civilian urinalysis programs. That approach reflects limited approval of compulsory urinalysis in circumstances where the Government has demonstrated that the duties of the employees warranted such testing and where the results were used for administrative, rather than prosecutorial, purposes. *Id.* at 281, *citing Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); and n. 2.

Going well beyond the constitutional analysis that the Supreme Court has applied in civilian society, we have approved prosecutorial use of permissive inferences in criminal proceedings to sustain convictions based solely upon the results of a drug test. To sustain a prosecution in such cases, we have required only that the results be supported by expert testimony explaining the underlying scientific methodology and the significance of the test result, so as to "provid[e] a rational basis for inferring that the substance was knowingly used and that the use was wrongful." *United States v. Graham,* 50 MJ 56, 58–59 (1999). We have permitted, but have not required, the factfinder to conclude on that basis that the Government has satisfied its burden to establish both elements of the offense—use of the controlled substance, as well as the wrongfulness of the use. *See, e.g., United States v. Thompson,* 34 MJ 287 (CMA 1992); *United States v. Ford,* 23 MJ 331 (CMA 1987); *United States v. Murphy,* 23 MJ 310 (CMA 1987); *United States v. Harper,* 22 MJ 157 (CMA 1986).

Urinalysis testing has proved to be a powerful tool in the effort to combat drug use in

---

1. This provision is based on *United States v. Harper,* 22 MJ 157 (CMA 1986) (discussed at 160 and 161, *infra*), and *United States v. Ford,* 23 MJ 331 (CMA 1987) (discussed at 160–61, *infra*). *See* Drafters' Analysis, Manual, *supra* at A23–11.

the military, maintain good order and discipline, and ensure combat readiness. Drug testing, however, is designed and performed by humans and, as such, is fallible. The possibility of a positive result from an error in the test or from unknowing ingestion of a substance that does not trigger any reaction on the part of the servicemember is the worst nightmare of every good servicemember and a cause of serious concern to the judicial system.

Reliance on urinalysis test results alone in courts-martial permits a criminal conviction to be adjudged solely on the basis of a test result when there is no other evidence of criminality, including no evidence of an observable reaction to the substance. Such a conviction may be adjudged in the case of a member of the armed forces who has given years of dedicated service to the country, who has an unblemished record, whose performance has been exemplary, who has served in combat, and who never has exhibited any impairment in function under the intensive daily scrutiny that military members receive from their superiors, peers, subordinates, friends, and family.

The result, in the case of conviction under Article 112a for use of LSD, may include a dishonorable discharge, confinement for 5 years, and total forfeitures. For a career servicemember, the discharge alone may result in the loss of hundreds of thousands of dollars in retired pay. For the member—and the member's family—the consequences may be devastating. Because the consequences of drug abuse in the military may be all the more devastating to the nation, we have sustained use of urinalysis test results where they logically permit a rational factfinder to conclude beyond a reasonable doubt that the results prove wrongful use. At the same time, we have not permitted use of test results where such logical proof of wrongful use has been lacking. See Art. 112a; United States v. Harper, supra.

■■■ Under applicable case law, the prosecution cannot rely solely on the presence in the body of the drug or its constituent elements. The cases which have permitted the inference of wrongfulness strictly

require that the prosecution also establish the reliability of the testing methodology and explain the significance of the results of the test of the accused's sample. The prosecution's expert testimony must show: (1) that the "metabolite" is "not naturally produced by the body" or any substance other than the drug in question (see, e.g., Harper, supra at 161); (2) that the cutoff level and reported concentration are high enough to reasonably discount the possibility of unknowing ingestion and to indicate a reasonable likelihood that the user at some time would have "experienced the physical and psychological effects of the drug," see id. at 163; Murphy, supra at 312; and (3) that the testing methodology reliably detected the presence and reliably quantified the concentration of the drug or metabolite in the sample. See Daubert, supra at 590, 113 S.Ct. 2786 (expert scientific testimony must "establish[ ] a standard of evidentiary reliability"). Once this showing is made, the prosecution is not required to disprove the possibility of unknowing ingestion in order to sustain the legal sufficiency of a conviction. See, e.g., Ford, 23 MJ at 336.

## B

The case before us was litigated in light of this well-established case law. This case involves the novel use of the GC/MS/MS testing procedure for LSD, which, according to the record, was conducted by only one laboratory in the United States and was used in no other jurisdiction for purposes of criminal prosecution.

The issue is not whether members of the armed forces may be subjected to urinalysis testing or whether such a test may be used as the basis for a court-martial. The answer to both questions is squarely in the affirmative. Likewise, the question is not whether sufficient evidence might be presented to sustain use of the GC/MS/MS test for LSD.

Instead, the specific question we must resolve is whether the prosecution—in this case—presented sufficient evidence on the record about the test that, under our case law, would permit a reasonable factfinder to conclude beyond a reasonable doubt that ap-

pellant used LSD and that the use was wrongful. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

In *United States v. Harper, supra,* our Court recognized the inferences of drug use and wrongfulness that could be drawn from a positive drug-test result supported by expert testimony explaining the significance of the result. In finding the evidence sufficient to allow a "permissive inference of wrongfulness" to be drawn in that case, we noted in particular two aspects of the expert testimony presented by the prosecution about marijuana testing: (1) that the reported "readings ... ruled out the possibility of passive inhalation"; and (2) "that these particular results indicated that the user at sometime experienced the physical and psychological effects of the drug." 22 MJ at 163. By contrast, the Government did not provide similar evidence of wrongfulness in this case.

Here, the prosecution introduced evidence that (1) LSD is not naturally produced by the body; (2) DoD has established a cutoff level of 200 pg/ml, above which all samples are reported as positive for LSD; (3) the GC/MS/MS test of appellant's urine sample reported a concentration level of 307 pg/ml; and (4) NTL's quantitative results with respect to testing for LSD in urine have been validated against other tests. Those other tests, however, were tests that DoD declined to validate for forensic purposes. The latter point, therefore, proves only that the GC/MS/MS test produced results consistent with a test that, itself, was not considered by the Department of Defense to be valid for purposes of criminal prosecution.

■ Of critical importance is that the Government did not prove the levels or frequency of error, which would indicate: (1) that the particular GC/MS/MS test reliably detected the presence of LSD metabolites in urine; (2) that GC/MS/MS reliably quantified the concentration of those metabolites; and

(3) that the DoD cutoff level of 200 pg/ml was greater than the margin of error and sufficiently high to reasonably exclude the possibility of a false positive and establish the wrongfulness of any use. In particular, the Government introduced no evidence to show that it had taken into account what is necessary to eliminate the reasonable possibility of unknowing ingestion or a false positive.

The evidence left open the question whether the cutoff level established by DoD and the concentration level reported by NTL, in view of the margin of error, would reasonably exclude the possibility of a false positive and would indicate a reasonable likelihood that at some point a person would have experienced the physical and psychological effects of the drug. This is the type of evidence we required in *Harper* to ensure that any use was wrongful.[2] It is missing in this case.

### C

The foregoing analysis leads us to the following disposition of the granted and specified issues: With respect to Specified Issue II, concerning the basis for the inference of wrongfulness, we conclude that there was no rational basis upon which the factfinders could draw a permissible inference of wrongfulness of use from the concentration of LSD reported in appellant's urine sample. It may well be in a future case that the Government could make the necessary showing with respect to the significance of the concentration levels and the reliability of this particular GC/MS/MS test or a follow-on version of the test. Because of the deficiencies in the prosecution's presentation in this case, however, the evidence would not permit a reasonable factfinder to conclude that the GC/MS/MS test result in this case (1) reasonably excluded the possibility of a false positive and (2) indicated a reasonable likelihood that at some point a person would have experienced the physical and psychological effects of the drug.

---

2. Paragraph 37c(5), Part IV, Manual for Courts–Martial, United States (1995 ed.), quoted *supra* at 159, recognizes that, contrary to the suggestion in the dissent by Judge Sullivan, 163, this standard—which follows our precedent in *Harper*—does not establish new law. None of the post-*Harper* cases cited by the dissent involved the issue of whether the DoD cutoff level was consistent with the *Harper* standard.

With respect to Specified Issue I, concerning the cutoff level, we note that the law does not "require a *particular* cutoff level in order for the prosecution to establish beyond a reasonable doubt appellant's knowing use of LSD." (Emphasis added.) To the extent that the prosecution seeks to rely on the permissible inference of knowledge from the presence of the drug in the sample, however, the cutoff level must be such as to rationally permit factfinders to find beyond a reasonable doubt that an accused's use was knowing.

In view of these considerations, we decline to address the Granted Issue and Specified Issue III in a manner that forecloses the Government from relying on the GC/MS/MS test or a follow-on version of the test in a subsequent case. It is appropriate to decide this case on a more limited basis. As noted earlier, our opinion leaves open the opportunity for the Government to make the necessary showing with respect to the significance of the concentration levels and the reliability of this particular GS/MS/MS test or a follow-on version of the test. Our discussion in Part B identifies the questions raised by the Government's presentation at trial in this case regarding the reliability of the testing procedure and also notes the type of evidence that could sustain a conclusion of reliability. We leave for a future case, presented in accordance with *Harper*, the issues concerning the rulings of a military judge with respect to reliability of expert testimony under *Daubert*.

## DECISION

The decision of the United States Army Court of Criminal Appeals is reversed. The findings and sentence are set aside. The Charge is dismissed.

SULLIVAN, Judge (dissenting):

I would affirm. There was proof in this case that LSD does not occur naturally in the body. There was also proof that the constituent elements of LSD were found in appellant's urine. Finally, there was expert testimony explaining this scientific proof and its meaning to the members. Our decisions require no more for the members to be able to determine guilt. *See United States v. Pabon*, 42 MJ 404, 406–07 (1995) (evidence sufficient where experts testify that test results consistent with use although not accompanied by sufficient physiological or psychological symptoms); *cf. United States v. Hunt*, 33 MJ 345, 347 (CMA 1991) (evidence not sufficient where no expert testimony whatsoever explaining test results); *see generally United States v. Boulden*, 29 MJ 44, 47 (CMA 1989).

In my view, the majority's reliance on *United States v. Harper*, 22 MJ 157 (CMA 1986), for additional proof requirements is fatally flawed. This case is quite different from *Harper*, where the question before the Court was the sufficiency of the Government's urinalysis evidence to show wrongful marijuana use, not wrongful LSD use, as in appellant's case. There, the quantitative testing evidence was offered to rule out the possibility of passive inhalation of marijuana smoke, not a reasonable possibility in a case involving the oral consumption of micro-dot LSD. Moreover, in *Harper, supra* at 163–64, this Court specifically noted that "it could not be determined whether appellant was actually experiencing the physiological or psychological effects of marijuana *at these times and places* [as charged.]" (Emphasis added.)

In reality, therefore, the majority makes new law in this case and, in the process, raises serious questions about military drug prosecutions based on our past cases. *Harper* was the first word, *not the last word* or the only word, on the subject of sufficiency of evidence in urinalysis cases. *See United States v. Bond*, 46 MJ 86 (1997); *United States v. Pabon, supra; United States v. Thompson*, 34 MJ 287 (CMA 1992); *United States v. Boulden, supra; United States v. Ford*, 23 MJ 331 (CMA 1987). Moreover, the majority's new approach to drug prosecutions goes far beyond the rules for proving drug cases now provided by the President in the Manual for Courts–Martial, United States (1998 ed.). *See* para. 37(c), Part IV. I must dissent.

Turning first to the new rule established in this case, it is one of evidentiary sufficiency

in urinalysis prosecutions. The majority asserts that knowing (wrongful) use of drugs requires more than scientific proof that the drug or its constituent elements are in a soldier's urine and that the body does not naturally produce them. In addition, it requires the Government to show

that the cutoff level and reported concentration are high enough to reasonably discount the possibility of unknowing ingestion and to indicate a reasonable likelihood that the user at some time would have "experienced the physical and psychological effects of the drug," see id. [Harper, 22 MJ] at 163; Murphy, supra [23 MJ] at 312.

50 MJ at 160. The majority concludes in this case as follows:

The evidence left open the question whether the cutoff level established by DoD and the concentration level reported by NTL, in view of the margin of error, would reasonably exclude the possibility of a false positive and would indicate a reasonable likelihood that at some time a person would have experienced the physical and psychological effects of the drug. This is the type of evidence we required in Harper to ensure that any use was wrongful. It is missing in this case.

50 MJ at 161 (footnote omitted).

In my view, the majority has misread this Court's opinion in Harper. In that case, we did consider the fact that the expert testified "that the nanogram readings ... ruled out the possibility of passive inhalation." We also considered the fact that the expert "testified that these particular results indicated that the user at sometime experienced the physical and psychological effects of the drugs." 22 MJ at 163 (emphasis added). However, this Court noted this additional circumstantial evidence in lieu of addressing the question whether a permissive inference of knowledge drawn from proof of use was alone sufficient to constitute proof beyond a reasonable doubt that a servicemember knowingly used drugs. Id. at 163, citing Ulster County Court v. Allen, 442 U.S. 140, 166–67, 99 S.Ct. 2213, 2229–30, 60 L.Ed.2d

777 (1979). We did not hold that the quantitative evidence proffered in Harper would be required in all cases in the future or that the permissive inference itself was constitutionally insufficient. In any event, we have not required such additional proof and expert testimony in subsequent cases. See United States v. Ford, 23 MJ 331, 336 (CMA 1987); see also United States v. Boulden, United States v. Thompson, United States v. Pabon, and United States v. Bond, all supra.

In addition, paragraph 37(c), Manual for Courts–Martial, United States, 1984, was amended in 1994 after the decisions of this Court in Harper and Ford. See Manual, supra (1994 ed.) at A23–18 and A23–19. Paragraph 37c now states:

(10) Use. "Use" means to inject, ingest, inhale, or otherwise introduce into the human body, any controlled substance. Knowledge of the presence of the controlled substance is a required component of use. Knowledge of the presence of the controlled substance may be inferred from the presence of the controlled substance in the accused's body or from other circumstantial evidence. This permissive inference may be legally sufficient to satisfy the government's burden of proof as to knowledge.

Manual, supra (1998 ed.) (emphasis added). As noted above, the majority, citing Harper, requires evidence that the controlled substance is present in the accused's body in such a quantity that an expert can opine that the effects of the drug would have been felt. I see no basis for this new requirement being added to the above Manual rule. See RCM 918(c), Discussion, Manual, supra ("but some other fact or circumstance from which, either alone or together with other facts or circumstances, one may reasonably infer the existence or nonexistence of a fact in issue" (emphasis added)).

I would also note that the majority's holding in this case is truly sua sponte in nature. The only issue at this court-martial was the reliability of the GC/MS/MS test to show the presence of LSD in a person's urine.* There

* The majority does not even decide the granted

issue concerning the showing of reliability made

was no motion for a finding of not guilty on the basis of insufficient proof of knowledge or any dispute concerning a permissive inference of knowledge being drawn solely on the basis of positive test results under DoD standards. *See* RCM 917. While a stronger case could have been made by the Government, none of the parties or the military judge read our past decisions as requiring such quantitative certainty.

In conclusion, I share the majority's concern that great care be taken when servicemembers are convicted at courts-martial on the basis of urinalysis testing. *See United States v. Mack*, 33 MJ 251 (CMA 1991); *United States v. Van Horn*, 26 MJ 434, 438 (CMA 1988); *United States v. Murphy*, 23 MJ 310 (CMA 1987). Nonetheless, the belated suggestion that we have misread or misapplied the decision of this Court in *Harper* and that the President has done the same is contradicted by our subsequent case law. In my view, the majority speculates that such scientific proof should exist for LSD, as it does for marijuana, and now decides for the first time that its admission should be mandatory. *Cf. Bond*, 46 MJ at 91 ("This Court will not use the rubric of legal sufficiency to usurp the powers of ... factfinders and enter our own view of guilt.") I do not join the majority's action in this case.

CRAWFORD, Judge (dissenting):

Just as this Court has done numerous times in the past, the majority has recognized the impact of drug abuse "on the readiness of the armed forces to engage in combat." 50 MJ at 158. However, it holds that the prosecution's evidence as to testing by Northwest Toxicology Laboratory (NTL) is not sufficiently reliable "to eliminate the reasonable possibility of ... a false positive" for LSD. *Id.* at 161. Because I do not agree with the majority that the trial judge abused his discretion in his "gatekeeper" role under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), I dissent.

## FACTS

The evidence of appellant's use of LSD arose as a result of a random urinalysis. Appellant's urine sample was sent to the Army's drug testing laboratory at Fort Meade, Maryland, where it was tested twice over a 4–day period using radioimmunoassay analysis (RIA) for LSD. Both tests indicated that appellant's urine contained LSD. Because RIA does not quantify the amount of the drug, the sample was then sent to NTL in Salt Lake City, Utah, for additional testing. At NTL, appellant's sample was tested by a methodology known as gas chromatography/tandem mass spectrometry (GC/MS/MS). After performing that test, appellant's urine showed a level of 307 picograms of LSD per milliliter. Department of Defense Directive 1010.1 establishes a cut off level of 200 picograms.

Dr. Rodger Foltz, the laboratory director of NTL, testified that the GC/MS/MS test is "based on scientific principles ... accepted by the scientific community" and represents the "state of the art" in testing for drugs. Other toxicology laboratories are using the same test; however, because the testing instrument costs about $350,000, its use is not widespread. This method of testing has been "presented at conferences on at least two occasions by two fellow toxicologists," where it was subject to peer review. Dr. Foltz testified that he published an article in a peer-reviewed journal, *Analytical Chemistry*, in 1992 on the GC/MS/MS testing employed at NTL. There are no other articles on this method, however, because the "normal practice" is for scientists to publish an article only when there is a problem.

To ensure the accuracy of NTL's testing, the Armed Forces Institute of Pathology (AFIP) sends NTL twenty "open quality-control samples" per month. These samples are presented for analysis, and the laboratory does not know what drug, if any, or what concentration of drugs is present. These

by the Government in this case with respect to GC/MS/MS testing. I agree with Judge Craw-

ford's dissent on this point.

blind samples have been received since 1993, after the laboratory was certified.

Additionally, AFIP itself conducted an "extensive review" of the procedures used at NTL to make doubly sure the methodology is reliable prior to awarding them a contract. After NTL had been given a number of samples and had passed the quality control of AFIP, the Army concluded that NTL's methodology for detecting LSD was "very accurate." Moreover, fifteen blind quality-control samples were returned by NTL to AFIP over a period of time, all of which were tested correctly. Additionally, AFIP sent ten "open quality controls" per month to NTL and the results of these tests fell within the standard deviation permitted for quality control. These open quality-control tests also were compared with two other labs who do the same type of testing and no significant statistical deviation was found between their results and NTL's findings.

Dr. Arthur J. McBay, a retired forensic toxicologist, testified that the GC/MS/MS was not accepted in the scientific community as a method of testing for drugs. However, he did say that this test has been accepted for use in hair analysis. Concerning the RIA test, Dr. McBay conceded that it is "a reliable means to screen for LSD."

Moreover, Dr. McBay testified he was familiar with the publications, *Analytical Chemistry* and the *Journal of Analytical Chemistry*, and, as a scientific peer, had reviewed an article concerning GC/MS/MS in the former. "The two reviews are looked at and accepted...." However, he indicated that there were not 100 papers on this topic but one, and that peer review of the single article does not constitute acceptance of the methodology. True peer review, he indicated, would be the same methodology being used by more than one lab. He admitted that the validity of the GC/MS/MS test was strengthened by the fact that it is used in two Navy laboratories. Additionally, in response to a hypothetical, Dr. McBay said that if other tests were getting "similar results" with quality control samples, this would "tend to validate the GC/MS/MS methodology."

Dr. Robert K. Simon, owner of Toxicology International, also testified for the defense. Dr. Simon testified concerning the GC/MS/MS procedure, as follows:

[G]as chromatography tandem mass spectrometer procedure ... combine[s] a gas chromatograph with essentially two mass spectrometers so that instead of having one mass spectrometer to try to identify a particular drug substance, a rather unique system has been established to combine two mass spectrometers together to give us some additional data that can hopefully be used for drug identification.

He also testified:

The difficulty in analyzing for this particular substance in urine, blood or any other biological fluid or even in a piece of—a tab of LSD paper is that the amount is extremely small. The dose that one takes of LSD is somewhere between perhaps 70 and 100 micrograms, that is 70 to 100 one-millionth of a gram, so it is a very small quantity. That then, diluted into the body then can possibly emerge into urine over a period of hours after use in concentrations that are in pecograms and that really is a unit that is one thousand lower than the normal drug substances appear which is nanograms, so we're at ten-to-the-minus-twelfth range of concentration of this drug per milliliter of urine.

Dr. Simon asserted that the equipment used at Northwest Toxicology is the only one in the country and has not been accepted in the scientific community.

He also testified that the reliability of this equipment at NTL and its results can be shown by use of blind tests confirmed by two other laboratories employing different methodologies. The judge then asked the following question for a member:

Q. Dr. Simon, I have this question for you. Based upon your experience gained from working drug testing for DoD, if GC/MS/MS is in experimental stages, why would DoD contract Northwest to conduct drug confirmation?

A. I think the answer to that question is, there is certainly a compelling interest in determining LSD in urine. Certainly the statistics in and outside of DoD tell us that LSD use has re-emerged in the late '80's and early '90's as a drug of choice among individuals, so there is a great interest in being able to develop this method. And certainly, Dr. Foltz is well recognized in the field of forensic toxicology and scientific research as a person highly capable to do this work. So I certainly think the interest is there and I think the reason DoD would contract with him is, he's a prime individual who has been involved in this type of research for many years. That's why they would actually contract with him.

Later, Dr. Simon was recalled. He testified that, because of the unusual peaks on the test, he would "disqualify th[e] entire batch," including the results pertaining to appellant. Then he explained in detail how the court members should examine these peaks and determine the reliability of the test for LSD.

In contrast, Dr. Foltz testified that the "commercial version" of the GC/MS/MS instrument was introduced in 1979 and there are more than 300 such "instruments in operation around the world" to do the same type of testing. Any argument that there has not been similar testing in universities loses its force because it is probably the result of high cost rather than rejection of the process. Even the defense expert, Dr. McBay, stated that the equipment is not available in many laboratories because it is expensive.

## DISCUSSION

This case initially started with the issue of whether admission of this expert testimony concerning knowing use of LSD was error. After oral argument, the Court further specified a number of issues.

***Specified Issue I: Whether any of the sources of applicable law require a certain cut-off level in order to prove knowing use of LSD beyond a reasonable doubt***

Both sides concede that there is no constitutional, Manual, statutory, or regulatory provision—except the Department of Defense directive at issue in this case—which establishes a particular cut-off level necessary for the prosecution to prove beyond a reasonable doubt appellant's knowing use of LSD. Of course, a directive or regulation prospectively could establish a different cut-off level. *See, e.g., United States v. Johnston,* 41 MJ 13 (CMA 1994).

Because both parties concede that there is no such specific cut-off level, I address the second specified issue concerning the sufficiency of the evidence.

***Specified Issue II: Sufficiency of scientific evidence to infer wrongful use of LSD***

Appellant contends that the Government did not present sufficient scientific evidence upon which to draw an inference that appellant knowingly or wrongfully used LSD. In fact, appellant argues that "[t]he Government did not introduce any direct evidence that appellant knowingly used LSD." Second Final Brief at 8. He contends that the Government did not show "sufficient evidence to explain the significance of the report that appellant's urine contained a concentration of 307 picograms of LSD." *Id.* at 14.

The Government begins its argument by stating that the factfinders may use "a permissive inference" to determine wrongfulness. Second Answer at 13. The Government contends that it presented expert testimony on the testing methods, the standards used, and the results of LSD use on the human body. *Id.* at 14. It explained to the members the DoD picogram cut-off level (200) and compared that to the picogram level in appellant's urine sample (307). *Id.* at 13–14.

When reviewing the sufficiency of the evidence, we give great deference to the factfinder's ability both to draw logical inferences from the evidence presented and to assess the credibility of the witnesses, including expert witnesses. We have stated:

The standard for determining the legal sufficiency of evidence supporting findings of guilty at courts-martial is well established. Judge Cox, writing in *United*

States v. Harper, 22 MJ 157, 161 (CMA 1986), stated, "[I]n this context, sufficient evidence generally means some legal and competent evidence from which a court-martial may find or infer beyond a reasonable doubt those facts required by law for conviction."

United States v. Pritchett, 31 MJ 213, 216 (CMA 1990)(footnote omitted). We went on to say: "Moreover, it is well established that, in applying this test, all inferences and credibility determinations must be drawn in favor of the prosecution." Id. at 216; see also, S. Childress and M. Davis, Federal Standards of Review § 9.02 at 9–8 (2d ed. 1992) ("[I]f inferences are required to be made from the factual evidence to the verdict, the court must review those in the light most favorable to the verdict"). This Court in Harper acknowledged that "[i]n the absence of evidence to the contrary, the prosecution may meet this burden [of proving wrongfulness] by reliance on a permissive inference of wrongfulness which has long been recognized by military law as flowing from proof of the predicate fact of use of a contraband drug." 22 MJ at 162. Further,

[i]t is quite clear from paragraph 213g(5), Manual [for Courts–Martial, United States, 1969 (Revised edition)] . . ., and our case law that the inference of wrongfulness is a permissive inference or presumption, not a mandatory inference or presumption. It does not relieve the prosecution of its burden of persuasion because it still requires the prosecution to convince the factfinder that the suggested conclusion of wrongfulness should be inferred based on the predicate facts proven.

(Citation omitted).

In Harper, this Court upheld an accused's conviction for use of marijuana where an expert testified that the nanogram level of marijuana in the urine sample "ruled out the possibility of passive inhalation" and "indicated that the user at sometime experienced the physical and psychological effects of the drug." The Court also noted that the accused in that case tested positive on three occasions. In addition, the accused's testimony "as a whole discounted" the possibility of innocent ingestion. 22 MJ at 163.

I am satisfied that there are many facts in the case at bar from which the members logically could draw an inference that appellant's use of LSD was knowing and unjustified, and, thus, wrongful.

An expert, Dr. Foltz, the laboratory director of Northwest Toxicology, testified that there has never been a report of other substances creating LSD in the body and excreting it in the urine. He also stated that his laboratory's drug tests "clearly" differentiate between LSD and any other "ergot alkaloid" contained in prescription medication.

Although no expert specifically discounted the possibility of passive ingestion, appellant himself acknowledged that, during the relevant time frame, he observed no signs that anyone in his residence was under the influence of a controlled substance. Appellant's testimony, combined with statements of the government experts, discount the possibility that appellant innocently ingested LSD.

Whether appellant experienced or was observed experiencing the effects of LSD is irrelevant to the issue of whether he knowingly used the drug. A defense witness who had been an emergency medical technician admitted on cross-examination that an individual who takes a low dosage of LSD might not exhibit outward signs of drug use.

Drawing all inferences and credibility determinations in favor of the prosecution, I would hold that the members logically could infer from the facts of this case that appellant's use of LSD was wrongful beyond a reasonable doubt.

***Specified Issue III: Reliability of testing procedures for LSD***

The standard of review for this evidentiary issue is whether the judge abused his discretion. *General Electric Co. v. Joiner*, 522 U.S. 136, ——, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997); *United States v. Houser*, 36 MJ 392 (CMA), cert. denied, 510 U.S. 864, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993). The Supreme Court indicated in *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786, that the overarching theme for admitting evidence is relevance and reliability. The Court, in dictum,

168

then indicated that there are a number of factors that the judge, who is a gatekeeper, may examine: (1) testing for error; (2) peer review and publication; (3) the potential error rate using a particular scientific technique; and (4) the degree of acceptance in the scientific community. *Id.* at 593–94, 113 S.Ct. 2786.

I would hold that the judge did not abuse his discretion in admitting the results of the GC/MS/MS test. These results were logically relevant to this case and the reliability is established by the four factors mentioned in *Daubert.* The reliability of the testing has been established by the fact that open-control testing by NTL compared favorably with two other labs testing on the same blind samples. The other laboratories were using the GC/MS test and the reliability of this test can be judicially noted. *State v. Cathcart,* 247 N.J.Super. 340, 589 A.2d 193, 199 (1991). Additionally, two prior RIA tests showed appellant's urine sample was positive for LSD.

In addition to empirical testing, the testing used in this case has been subject to peer review in two separate publications. Dr. Foltz published an article in *Analytical Chemistry.* He also published an article in the *Journal of Chromatography* in 1990. Further, this method of testing was presented at two other conferences by fellow toxicologists. Since these presentations and articles occurred, appellant can point to no adverse commentaries or studies indicating that GC/MS/MS procedures are unreliable.

There have been no false positives at NTL, and, as previously mentioned, appellant's sample twice tested positive for LSD before it was sent to NTL. Thus, the chance of error for this test is minimal.

The scientific principles used in this case are "state of the art." Other toxicology laboratories are using the same test which shows acceptance within the scientific community.

For these reasons, I dissent.