### UNITED STATES

v.

**Robert L. BARNES, Staff Sergeant (E–6), U.S. Marine Corps.**

### NMCM 94 01927.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 12 May 1994.

Decided 31 May 2000.

LT M. Eric Eversole, JAGC, USNR, Appellate Defense Counsel.

LT Margaret E. Jolly, JAGC, USNR, Appellate Government Counsel.

Before DeCICCO, Chief Judge, TROIDL, Senior Judge, and ANDERSON, Appellate Military Judge.

DeCICCO, Chief Judge:

This case is before us for the third time. A special court-martial composed of a military judge convicted Staff Sergeant Barnes, contrary to his pleas, of a single specification of using marijuana in violation of Article 112a, Uniform Code of Military Justice, 10 U.S.C. § 912a. The adjudged and approved sentence consists of a bad-conduct discharge.

In our first review of the case, we found plain error in the staff judge advocate's post-trial recommendation to the convening authority. The basis of the error was the omission of information concerning the appellant's receipt of the Navy Commendation Medal for his service in a ground combat element in Somalia in 1992 and 1993. We returned the record for a new recommendation and action. *United States v. Barnes,* 44 M.J. 680 (N.M.Ct.Crim.App.1996). A new recommendation was completed which listed the appellant's Navy Commendation Medal. The convening authority again approved the sentence as adjudged.

In our second review, we found merit in the appellant's argument that he had been denied effective assistance of counsel in the post-trial proceedings before the convening authority's new action. Prior to that action, the appellant's defense counsel decided not to submit any clemency matters to the convening authority without ever attempting to contact the appellant. We again set aside the action of the convening authority and directed another recommendation and action. *United States v. Barnes,* No. 9401927 (N.M.Ct.Crim.App. 15 Aug. 1997)(unpublished decision). On 16 October 1998, the

convening authority approved the sentence again.

In this appeal, the appellant raises four errors for our consideration. Our resolution of the first issue renders it unnecessary to discuss the other three. Applying the decision of our superior court in *United States v. Campbell*, 50 M.J. 154 (1999), *supplemented on reconsideration*, 52 M.J. 386 (2000), we find that the evidence was legally insufficient in this case.

### Facts

Following the appellant's not guilty pleas, the prosecution's case-in-chief was based solely on the result of a urinalysis test. The prosecution called three witnesses: the urinalysis observer, the urinalysis coordinator, and a forensic chemist. The first two witnesses testified as to the collection procedures and the forwarding of the appellant's urine sample to the Navy Drug Screening Laboratory (NDSL) in San Diego. The appellant did not contest any part of the collecting, forwarding or testing of his urine sample at trial, and does not challenge those matters now. We find no deficiencies in these portions of the prosecution's case.

The other witness called by the prosecution during its case-in-chief was Lieutenant Commander Gerald Grimsley, Medical Service Corps, U.S. Navy, the Deputy Technical Director of NDSL San Diego, and one of three forensic chemists who review positive urinalysis results at the NDSL. LCDR Grimsley testified as to the layout of the laboratory, the security measures taken at the lab, and the routine procedures concerning handling and testing of urine samples. He stated that NDSL San Diego utilized three tests: two screening tests using a radio-immuno assay procedure and a confirmation test, the gas chromatography/mass spectrometry test. He stated that a sample would be reported as positive if the result was at or above the Department of Defense cutoff level in each of the three tests. In the case of marijuana, a sample would be reported as positive if it contained at least 15 nanograms per milliliter (ng/ml) of the marijuana metabolite (THC).[1] The test on the appellant's sample resulted in a reading of 19 ng/ml. LCDR Grimsley testified that the human body does not naturally produce THC, that it must be ingested, and that it cannot come from anything but cannabis plant material. He said the testing conducted in the laboratory was extremely accurate and reliable.

On cross-examination, the defense attempted to show that a urine sample could test positive if one ate marijuana without heating it. LCDR Grimsley disagreed and adhered to his opinion that marijuana must be heated before there would be any psychoactive effects. He stated that he could not render an opinion either as to the method of ingestion or whether the individual whose urine was tested "felt the physiological effects." Record at 27.

On redirect examination, LCDR Grimsley described the effects that marijuana and its metabolite have on the human body. He said that, depending on the amount of THC, an individual could experience a feeling of euphoria, an altered perception of time, an increase in blood pressure, a flushed feeling, giddiness, talkativeness, and increased hunger. Record at 28. He emphasized that the experience of the effects would depend on the amount ingested, and that the more one ingests, the stronger the effects. He did not specifically relate these effects to a person with a level of 19 ng/ml.

The appellant testified in his own defense. He stated that he had never knowingly ingested marijuana or any other illegal substances in his life. He had been tested many times before, and he had never had a positive test result. He had no explanation for the positive result and had "racked his brain" to no avail. On cross-examination, he denied asking his neighbor for marijuana, but admitted he had observed his neighbor use marijuana. On redirect examination, he added that he would leave when he saw his neighbor use marijuana.

Also during the defense case, the appellant called a lieutenant colonel, a captain, and a staff sergeant as character witnesses. All three testified to the appellant's good mili-

---

1. The actual chemical name for the metabolite of marijuana is delta–9–THC–9–carboxylic acid.

tary character and truthfulness. On cross-examination, trial counsel was permitted to ask the lieutenant colonel and the captain, over defense objection, if they were aware that the appellant socialized on a regular basis and spent time in the presence of a person who used marijuana in front of the appellant. Both said they were not aware, and that such an association would affect their opinions of the appellant's character.

In its case on rebuttal, the prosecution called the appellant's neighbor, Mr. Derek Bennett. Mr. Bennett testified that he smoked marijuana four or five times in the appellant's presence, that the appellant did not leave immediately, and that the appellant asked him for marijuana on two occasions, once before the urinalysis and once after. Mr. Bennett said he never gave the appellant marijuana because he knew the appellant was a Marine and was not allowed to use it. He added that he thought the appellant was joking when he asked for it. Under cross-examination, Mr. Bennett stated that he was born with a collapsed lung, and this event affected half of his brain. He was on disability, could not read or write, and he admitted that his memory was not very good. There was no evidence that anyone had ever seen the appellant actually possess or use marijuana. On surrebuttal, the appellant again denied having asked Mr. Bennett for marijuana.

### Discussion

In its original opinion in *Campbell*, the Court of Appeals for the Armed Forces held that the prosecution had failed to prove the frequency of error that would indicate that a gas chromatography tandem mass spectrometry test reliably detected the presence of the metabolites of lysergic acid diethylamide. It also found a failure of proof that the test reliably quantified the concentration of the metabolites and that the Department of Defense (DoD) cutoff level of 200 picograms per milliliter was greater than the margin of error and was high enough to reasonably exclude the possibility of a false positive and establish the wrongfulness of any use. *Campbell*, 50 M.J. at 161. The Court added:

> To the extent that the prosecution seeks to rely on the permissible inference of knowl-

edge from the presence of the drug in the sample, however, the cutoff level must be such as to rationally permit factfinders to find beyond a reasonable doubt that an accused's use was knowing.

*Id.* at 162.

██ The Court listed three factors that the prosecution's evidence must show to permit the invocation of the inference of wrongful use:

> Under applicable case law, the prosecution cannot rely solely on the presence in the body of the drug or its constituent elements. The cases which have permitted the inference of wrongfulness strictly require that the prosecution also establish the reliability of the testing methodology and explain the significance of the results of the test of the accused's sample. The prosecution's expert testimony must show: (1) that the "metabolite" is "not naturally produced by the body" or any substance other than the drug in question [citation omitted]; (2) that the cutoff level and reported concentration are high enough to reasonably discount the possibility of unknowing ingestion and to indicate a reasonable likelihood that the user at some time would have "experienced the physical and psychological effects of the drug" [citations omitted]; and (3) that the testing methodology reliably detected the presence and reliably quantified the concentration of the drug or metabolite in the sample.

*Id.* at 160. The Court stated that this was well-established case law and did not establish new law. *Id.* at 161, n. 2.

██ In its opinion on reconsideration, the Court stated that the prosecution "may" demonstrate the relationship between the test result and the permissive inference of knowing, wrongful use through expert testimony establishing the three factors cited above. However, the three-part standard does not necessarily constitute the only means of proving knowing use and "[i]f the test results, standing alone, do not provide a rational basis for inferring knowing use, then the prosecution must produce other direct or circumstantial evidence of knowing use in

order to meet its burden of proof." *Campbell*, 52 M.J. at 388.

In the case at bar, the prosecution presented testimony on the first and third *Campbell* factors, but it presented no evidence as to the second. LCDR Grimsley did not testify that the cutoff level of 15 ng/ml and the reported concentration of 19 ng/ml were high enough to reasonably discount the possibility of unknowing ingestion. Moreover, he specifically declined to opine as to whether this appellant or anyone else with a test result of 19 ng/ml of THC would have experienced the physiological effects of THC.

▄▄▄ The offense of wrongful use of marijuana has two elements: that the appellant used marijuana, and that the use by the appellant was wrongful. MANUAL FOR COURTS-MARTIAL, UNITED STATES (1984 ed.), Part IV, ¶ 37b(2).[2] The first element contains a requirement that an accused have knowledge of the presence of the substance. *United States v. Mance*, 26 M.J. 244, 253 (C.M.A.1988). The fact that the appellant's urine contained THC, therefore, provided only part of the evidence on the first element. The prosecution still had to prove knowledge of the presence of the drug. The inference provided by case law, if available, would provide this proof. However, in view of the lack of evidence in this case on the second factor from *Campbell*, the prosecution was not entitled to the benefit of this inference of knowing, wrongful use. *Campbell*, 52 M.J. at 388.

Without this inference, our superior Court's opinion on reconsideration allows us to examine the record for other "direct or circumstantial evidence of knowing use." *Id.* We have considered all of the other evidence in the record, particularly the appellant's presence where marijuana was being used and the testimony that he twice requested marijuana from Mr. Bennett. We have concluded that such evidence did not provide legally sufficient proof to rationally permit the factfinder to find that the accused's use was knowing during the time period alleged. The fact that he associated with a drug user and that he may have asked for marijuana from him neither proves nor disproves that the appellant's use of marijuana in this instance was knowing and wrongful. *See United States v. Perry*, 37 M.J. 363 (C.M.A.1993).

**Conclusion and Disposition**

We therefore conclude that the prosecution's evidence was legally insufficient. This requires us to set aside the appellant's conviction.

Accordingly, the findings and sentence are set aside, and the Charge is dismissed.

Senior Judge TROIDL concurs.

ANDERSON, Judge (*dubitante*):

In light of *United States v. Campbell*, 50 M.J. 154 (1999), *supplemented on reconsideration*, 52 M.J. 386 (2000), I acquiesce *dubitante* in the result. *See United States v. Kelly*, 45 M.J. 259, 260 (1996)(holding that service courts of criminal appeals are not free to depart from precedent set by Court of Appeals for the Armed Forces); *but see United States v. Tualla*, 52 M.J. 228 (2000)("*Stare decisis* is a principle of decision making, not a rule, and need not be applied when the precedent at issue is 'unworkable or . . . badly reasoned.' ").

In *Campbell*, our superior Court held that for the Government to establish the permissive inference of knowing, wrongful use of drugs in a urinalysis case, an expert must testify that both "the [DoD] cutoff level *and* the reported concentration are high enough to reasonably discount the possibility of unknowing ingestion and to indicate a reasonable likelihood that the user at some time would have 'experienced the physical and psychological effects of the drug.' "[1] *Camp-*

---

2. This was the edition of the Manual for Courts-Martial in effect during the appellant's court-martial in 1994.

1. Although our superior Court commented in *Campbell* that this requirement is not new law, it nonetheless appears to be a major shift in the treatment of urinalysis cases. *See United States v. Bond*, 46 M.J. 86 (1997); *United States v. Pabon*, 42 M.J. 404 (1995); *United States v. Thompson*, 34 M.J. 287 (C.M.A.1992); *United States v. Boulden*, 29 M.J. 44 (C.M.A.1989); *United States v. Ford*, 23 M.J. 331 (C.M.A.1987); *United States v. Harper*, 22 M.J. 157, 160–163 (C.M.A.1986); Major Walter M. Hudson & Major Patricia A. Ham, *United States v. Campbell: A*

*bell*, 50 M.J. at 160 (citing *United States v. Harper*, 22 M.J. 157, 163 (C.M.A.1986)) and *Campbell*, 52 M.J. at 388 (emphasis added). This cutoff/effect requirement will create several problems with the current criminal prosecution of drug use offenses within the military.

First, the DoD cutoff requirement under the *Campbell* test makes it virtually impossible for the Government to establish a permissive inference of knowing, wrongful use of drugs based on the results of a urinalysis test. The DoD cutoff levels were designed to accurately identify the presence of a drug in a person's body, not to determine whether the user felt the effects of the drug. *See* Affidavit of Aaron J. Jacobs of 15 June 99 at 4–5. As explained by one expert, "the cutoffs were selected at least three times above levels that could be detected," essentially "to negate the possibility of false positives." *Id.* at 5. Because the cutoff levels were not established to reasonably discount the possibility of unknowing ingestion or to determine whether the user felt the effects of the drug, the cutoff level requirement of *Campbell* cannot be satisfied.

Second, the concentration of the drug or metabolite in a urine sample will have to be "very high" in order for an expert to testify that the possibility of unknowing ingestion can be reasonably discounted and that a reasonable likelihood exists that the user would have felt the effects of the drug. *Id.* at 6–7. The net result of this requirement is twofold: (1) many identified drug abusers will go unpunished; and (2) service members will learn to use drugs earlier in the holiday/weekend liberty period to lessen their urine concentration and avoid prosecution.

"If, as *Campbell* seems to indicate, it is now required that, to draw the permissive inference of wrongfulness, an expert must testify that the possibility of innocent ingestion can be reasonably discounted or that it is reasonably likely that the user felt the physical or psychological effects of the drug, it is virtually certain that in many cases the prosecution's proof will fail." Hudson & Ham, *Campbell*, ARMY LAW., May 2000 at 22. "*Campbell* thus may be a way to make urinalysis prosecutions much more difficult, and more like civilian testing programs, and thereby cause the government to use administrative methods, rather than criminal prosecutions." *Id.* at 20.

As a result of the cutoff/effect requirement of *Campbell*, the Government now has the burden to discount the affirmative defense of innocent ingestion in its case-in-chief. This reverses the normal order of proof. In addition, although one does not have to feel the effects of a drug to be guilty of wrongful use, by requiring the Government to show the reasonable likelihood of effects in its case-in-chief, our superior Court elevates it to an element of proof.

If DoD intends to continue to successfully prosecute illegal drug use with the results of a urinalysis test after *Campbell*,[2] it has two clear options. One, it may seek a statutory fix in Article 112a, UCMJ, 10 U.S.C. § 912a, whereby the DoD cutoff levels are established as a per se standard for illegal drug use, much like a blood/alcohol, blood/breath concentration of 0.10 or greater is set as a

---

*Major Change for Urinalysis Prosecutions?*, ARMY LAW., May 2000 at 20–22. *See also United States v. Graham*, 50 M.J. 56, 58–59 (1999).

2. The consequences of *Campbell* have been summarized as follows:

*Campbell* could result in [a] significant shift in the trying of so-called "paper" urinalysis cases, at least when the reported level of drug in the urine is at or near the cutoff level. Administrative actions ... rather than trial by court-martial could potentially become the alternative means of disposition for this class of drug offenses. Furthermore, it seems logical that Article 15, UCMJ, punishments would also decrease. A soldier could turn down the Article

15 and demand trial by court-martial, knowing the prosecution's potential problems of proof. This, in turn, could potentially decrease the number of urinalysis tests conducted, because the test's significance as a drug deterrent will diminish. Indeed, one can postulate a "worst case scenario" for the government: if the consequences of a positive urinalysis result are purely administrative, this might create an incentive for soldiers who want to be discharged to take drugs and be subsequently administratively separated.

Hudson & Ham, *Campbell*, ARMY LAW., May 2000 at 25.

per se standard for illegal intoxication in the drunk driving offense, Article 111, UCMJ, 10 U.S.C. § 911. Two, it may reset the DoD cutoff levels at such a high level that an expert can provide the testimony necessary to satisfy the cutoff/effect requirement of *Campbell.* Because the first fix will provide for better utilization of current technology and more uniformity in result, it is preferable to the second.