*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
KISOR, DALY, and MIZER
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Rory R. HIRST**
Gunnery Sergeant (E-7), U.S. Marine Corps
*Appellant*

**No. 202300208**

_____

Decided: 4 September 2024

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Andrea C. Goode (arraignment)
Derek A. Poteet (trial)

Sentence adjudged 24 April 2022 by a special court-martial convened at Marine Corps Base Camp Pendleton, California, consisting of a military judge sitting alone. Sentence in the Entry of Judgment: reduction to E-5 and confinement for 90 days.

For Appellant:
*Ms. Bethany L. Payton-O-Brien*
*Ms. Elizabeth A. Harvey*
*Lieutenant Commander Leah M. Fontenot, JAGC, USN*

For Appellee:
*Lieutenant Rachel E. Noveroske, JAGC, USN*
*Major Tyler W. Blair, USMC*

Judge MIZER delivered the opinion of the Court, in which Senior Judge KISOR and Senior Judge DALY joined.

————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

————————————

MIZER, Judge:[1]

Appellant was convicted, contrary to his pleas, of one specification of wrongful use of a controlled substance, in violation of Article 112a, Uniform Code of Military Justice (UCMJ).[2] We have jurisdiction to review this case under Article 66(b)(1)(A), UCMJ.[3]

Appellant challenges the factual sufficiency of his conviction for the wrongful use of 3,4 Methylenedioxymethamphetamine (MDMA).[4] After weighing the evidence, and with appropriate deference to the fact that the military judge saw and heard the witnesses below and made findings of fact entered into the record, we are clearly convinced the military judge's finding of guilt was against the weight of the evidence. Accordingly, and as set forth fully below, Appellant's conviction is set aside and the case is dismissed with prejudice.

---

[1] The Court is grateful for the assistance of two judicial clerks, Ms. Isis Willis and Lieutenant Allison Baglini, in drafting this opinion.

[2] 10 U.S.C. § 912a.

[3] 10 U.S.C. § 866(b)(1)(A); *United States v. Hirst*, 2024 CCA LEXIS 134, __ M.J. __ (N-M. Ct. Crim. App. 2024); *United States v. Vanzant*, 2024 CCA LEXIS 215, __ M.J.__ (A.F. Ct. Crim. App. 2024); *United States v. Mieres*, 2024 CCA LEXIS 226, __ M.J.__ (C.G. Ct. Crim. App. 2024).

[4] We have considered Appellant's other assignments of error. *See, United States v. Scott*, No. 24-0063/AR, 2024 CAAF LEXIS 68 (C.A.A.F. Feb. 1, 2024). But, in light of our decision, it is unnecessary to address them.

## I. BACKGROUND

American poet and Presidential Medal of Freedom honoree Maya Angelou once famously opined, "Believe people when they tell you who they are."[5] At his court-martial, Appellant elected to testify in his own defense, and he told the military judge that he did not use MDMA.[6] Further, he told the military judge that he couldn't explain why a sample of his urine tested positive for MDMA after a unit sweep just after the 4th of July, 2021.[7] With due respect to the late Ms. Angelou, that's a story we've heard before—more than once.

But Appellant isn't just any Marine. Eight of his fellow Marines testified as to his character for truthfulness, law abidingness, and that he is an outstanding Marine. Additional Marines submitted sworn declarations to the same effect.

And these weren't just ordinary Marines either. In both its closing argument and rebuttal, the Government called these Marines "stellar Marines"[8] who were "truly impressive."[9] At one point, the military judge briefly interrupted trial counsel's argument simply to state the obvious: there really were a large number of impressive Marines testifying on Appellant's behalf.[10]

We agree. One of these Marines, Lieutenant Colonel (LtCol) R.L. described Appellant's courage under enemy fire during the thirty-day battle for Marjah, Afghanistan in 2010, which resulted in Appellant receiving a Navy-Marine Corps Commendation Medal with a "V" device for Valor. He testified that, without Appellant, "we probably would have had more casualties during, you

---

[5] MAYA ANGELOU, A SONG FLUNG UP TO HEAVEN 82 (2002). A similar quote, "When someone shows you who they are, believe them, the first time," is often misattributed to Ms. Angelou. *See, e.g, United States v. Miner*, 2021 U.S. Dist. LEXIS 130547 (E.D.N.Y. 2021).

[6] R. at 658.

[7] The military judge acquitted Appellant of another charge and specification of wrongful use of MDMA almost two months earlier. Obviously, alleged conduct for which Appellant was acquitted has no bearing on this appeal. *United States v. Bennitt*, 74 M.J. 125, 129 (C.A.A.F. 2015) ("The CCA…cannot find as fact any allegation in a specification for which the fact-finder below has found the accused not guilty.")(internal citation omitted).

[8] R. at 778.

[9] R. at 808.

[10] R. at 809.

know, the 30 days of sustained combat."[11] He called the Marines he served with in that battle "Marine Corps rock stars."[12]

And that is borne out by Appellant's citation, which describes how Appellant repeatedly exposed himself to enemy fire during a Taliban ambush. After directing the fire of his fellow Marines on the enemy, Appellant returned to the kill zone to rescue a Marine who had succumbed to heat exhaustion. He then returned to the kill zone again and bounded deeper into the ambush to join four Canadian Operational Mentor and Liaison Team members who were pinned down by enemy fire.

Another Marine, LtCol D.P., who fought alongside Appellant in Marjah, posed a question to himself while testifying: "would [he] serve with this Marine in combat, do you find him trustworthy?"[13] He testified that he would do so again, and added that his answer wasn't hypothetical.

Mr. J.A., a former Marine sergeant who at the time of trial was a civilian maintainer of F-18s in Miramar, California, was asked about Appellant's military character. He replied, "Look at his chest," a reference to Appellant's numerous personal awards.[14] Chief Warrant Officer 2 D.M. ominously predicted that the "next fight's going to be a big one," and the Marine Corps will need Appellant in that fight.[15] GySgt J.M., who was in his third year at the University of San Diego as part of the Marine Corps' Enlisted to Officer Program, described Appellant simply: "superman."[16]

Mr. J.A. also described Appellant as a "phenomenal athlete" and, along with other witnesses, described attending Mixed Martial Arts tournaments where Appellant competed semi-professionally.[17] None of these stellar Marines, to include his roommate, and others who spent time with him during the 4th of July weekend in 2021, saw him use MDMA or appear to be under the influence of drugs when the Government alleges he was wrongfully using MDMA.

---

[11] R. at 977.

[12] R. at 977.

[13] R. at 645.

[14] R. at 714; 749.

[15] R. at 932.

[16] R. at 611.

[17] R. at 757; R. at 585-86.

And so what does the Government offer to suggest that *this* Marine, in his eighteenth year of service, suddenly began using MDMA? A positive urinalysis and the permissive inference.[18] That's it. And that's being charitable.

The Marine Corps' Urinalysis Program Coordinator's handbook states that Urinalysis Program Coordinators (UPCs) "must always package, document, and ship with the idea that the results will be used in a court-martial."[19] "Therefore, samples shall be shipped immediately, but not later than 48 hours after the collection as a best practice."[20]

But the Substance Abuse Control Officer (SACO)[21] for Appellant's unit, Staff Sergeant (SSgt) D.W., testified that he sent Appellant's urine sample to the Navy's Drug Screening Laboratory (NDSL) at Great Lakes, Illinois, on 3 August 2021—twenty-eight days after the UPC handbook states they "shall"

---

[18] To convict Appellant of wrongful use of MDMA under Article 112a, UCMJ, the Government was required to prove that Appellant used that controlled substance and that the use was wrongful. Manual for Courts-Martial, United States (2019 ed.) (MCM), pt. IV, ¶ 50.b.(2). And where there is evidence that an accused's body contained MDMA, the factfinder may infer that the accused used the substance knowingly. *United States v. Webb*, 66 M.J. 89, 93 (C.A.A.F. 2008). Critics of this so-called permissive inference have argued since its inception that it amounts to a judicially-created "absolute-liability offense, no matter how we rationalize it or what we call it." *United States v. Green*, 55 M.J. 76, 86 (C.A.A.F. 2001)(Gierke, J., dissenting). We agree, and we are joined by at least one of our colleagues on our sister Court of Criminal Appeals. *United States v. Hernandez*, 2023 CCA LEXIS 104, *21 (A.F. Ct. Crim. App. 2023)(Key, J. dissenting). We note that the primary responsibility for balancing the constitutional rights of servicemembers against the needs of the military rests with Congress. *United States v. Wheeler*, __ M.J. __ (C.A.A.F. 2024)(citing *Solorio v. United States*, 483 U.S. 435, 447 (1987)). And the only action Congress has taken in this arena is to require the Government to prove *both* elements of wrongful use of a controlled substance. In our view, we must give "particular deference" to Congress's determination. *Id.* (citing *Middendorf v. Henry*, 425 U.S. 25, 43 (1976). But *Green* remains binding precedent, and our only recourse is to express our view and urge our superior Court to reconsider its precedent. *United States v. Allbery*, 44 M.J. 226, 228 (C.A.A.F. 1996).

[19] Def. Ex D at 24.

[20] *Id.*

[21] The UPC's handbook states the "UPC's role is not the same as the SACO. The UPC's primary duty is to execute the command's urinalysis testing, while the SACO serves as the overseer of the testing event and advisor to the Commander on all matters relating to urinalysis, including Marine Corps policy and related procedures, collection, and transportation of urinalysis samples." Defense Ex E at 7.

be shipped.[22] On cross-examination, SSgt D.W. testified that the UPC handbook's 48-hour requirement was just a "guideline."[23] He added, "I do not use that handbook to guide what I do in my job."[24] According to him, with the careers of his fellow Marines hanging in the balance, "there's no timeline."[25]

To his credit, he apparently believed that to be true because SSgt D.W.'s own urine sample sat in a secured wall locker for six months before his UPC shipped it.[26] He also didn't conduct the required monthly testing of his urinalysis observers, including those who collected Appellant's urine sample in July 2021.[27]

As for the chain-of-custody documents for that sample, which the UPC Manual describes as critical in a criminal case,[28] there are at least two versions of what is purportedly the same document.[29] On one version, the one that was mailed to the NDSL, the dates for when Appellant's sample was removed from secured storage and prepared for shipment are blank.[30] And so there is no documentation accounting for the whereabouts of Appellant's urine sample from 6 July 2021, when a UPC, Sergeant (Sgt) I.K., transferred that sample to SSgt D.W. for secured storage, and 16 August 2021, when it was received by an authorized carrier. That carrier then delivered it to the NDSL on 24 August 2021.

But on the version of the document maintained by SSgt D.W., the missing dates are written in pen—3 August 2021.[31] SSgt D.W. testified that he filled in the missing dates, but he wasn't "really sure exactly when."[32] He denied that he had completed the paperwork after the NDSL informed him that Appellant's sample had tested positive for MDMA.[33] SSgt D.W. testified that he

---

[22] R. at 214.

[23] R. at 245.

[24] R. at 247.

[25] R. at 252.

[26] R. at 246.

[27] R. at 357; 392.

[28] Def. Ex D at 24.

[29] *See* Def.Ex. BB.

[30] P.E. 7 at 5.

[31] R. at 284.

[32] R. at 284.

[33] R. at 285.

couldn't explain the discrepancy,[34] and attributed it, during questioning from the Government, to "honestly, like, how lazy I [was] that day."[35] He agreed that his failure to fill out the chain-of-custody paperwork was sloppy, "Yes, sloppy."[36]

But that's not the only discrepancy on the chain of custody paperwork in this case. Sgt I.K. testified that he signed the original Department of Defense Form 2624, and that SSgt D.W. made copies as necessary.[37] But with that being the case, he could only guess as to why his signature was different on two versions of what is purportedly the same document, even though he testified that it was a version of his signature on each.[38]

In the face of this record, the Government conceded, "there's been a number of issues with the SACO program identified…[t]here's no doubt about it."[39] But, according to the Government, these omissions from the chain-of-custody paperwork *only* affected the documentation of when Appellant's sample was secured, prepared for shipment, and moved before it was mailed on 3 August 2021.[40] According to the Government, the inability to document the whereabouts of a urine sample for nearly a month doesn't "mean the sample's untrustworthy[.]"[41] After all, argued the Government, SSgt D.W. testified Appellant's urine sample had been locked away in a wall locker in his office until it was mailed, so there was no need for documentation of the chain of custody.

But the breakdown of SSgt D.W.'s SACO program wasn't confined to the critical documentation related to the chain of custody in this case. Discrepancies for Appellant's unit noted by the NDSL during SSgt D.W.'s tenure as the SACO totaled more than thirty-one pages.[42] While the vast majority of these discrepancies involved leaking bottles, some of the boxes sent to the NDSL

---

[34] R. at 267; 285.

[35] R. at 302.

[36] R. at 271.

[37] R. at 359.

[38] R. at 359-60.

[39] R. at 800.

[40] R. at 801.

[41] R. at 801.

[42] Def.Ex. H.

were missing the urine samples listed on SSgt D.W.'s paperwork, some contained the wrong Unit Identification Code, some had tamper-proof seals that were broken, other specimens had two seals, signatures and dates were missing, some of the paperwork was missing entirely, boxes were improperly packaged, the initials of some Marines didn't match those on the sample, there were insufficient samples, there were discrepancies in the initials of the purported observers, and there were discrepancies with the DoD identification numbers on the labels of some of the samples.

In the box that contained Appellant's 6 July 2021 urine sample, the urine samples belonging to three other Marines had leaked and urine spilled into the secondary plastic bags inside the box.[43] However, according to Dr. R.R., an employee of the NDSL and an expert in forensic toxicology, only Appellant's urine sample tested positive for MDMA.

And the evidentiary problems that plague this case weren't limited to the SACO program administered by SSgt D.W. Dr. R.R also testified that an employee of the lab, Mr. K.K., was suspended for three days in July 2021 for improperly pouring samples, "which nearly lead [sic] to a false negative test result."[44]

Mr. K.K.'s notice of suspension, a fitting example of the attention to detail that pervades this case, rightly noted that mispouring urine samples "directly impacts the forensic integrity of the lab, endager [sic] DoD certification and damaging [sic] the the [sic] credibility of the lab's work product in courts of law[.]"[45] And if you are curious as to the drug at issue in Mr. K.K.'s suspension, well it was MDA, a metabolite of MDMA.[46]

Finally, Dr. R.R. testified that the level of MDMA in what was purportedly Appellant's urine sample was so low that he may not have felt the effects of the drug.[47] And, given these levels, he testified that he was unable to opine as to whether Appellant's use of MDMA was wrongful.[48]

---

[43] R. at 478. The Government's brief incorrectly asserts that Appellant's bottle was leaking when it arrived at the NDSL. Gov't Ans. at 6. It wasn't. P.E. 7 at 4.

[44] R. at 522-23; Def. Ex U at 3.

[45] D.E. U at 3.

[46] R. at 533; 537.

[47] R. at 532.

[48] R. at 532-33.

And so we arrive at the intersection of the so-called good Marine defense and the permissive inference of wrongfulness authorized—but not required[49]—by precedent.

## II. DISCUSSION

### A. Law

Article 66(d)(1)(B), Factual Sufficiency Review, provides:

> (i) In an appeal of a finding of guilty . . . the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof.
>
> (ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
>
> > (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
> >
> > (II) appropriate deference to findings of fact entered into the record by the military judge.
>
> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.[50]

Accordingly, "to trigger factual sufficiency review under the present Article 66(d)(1)(B), Congress requires two circumstances be present: (1) a request of the accused; and (2) a specific showing of a deficiency in proof."[51] To make a specific showing of a deficiency in proof, "an appellant must identify a weakness in the evidence admitted at trial to support an element (or more than one element) and explain why, on balance, the evidence (or lack thereof) admitted at trial contradicts a guilty finding."[52] Then, "this Court will weigh the evidence in a deferential manner to the result at trial. If we are clearly convinced

---

[49] *United States v. Hildebrandt*, 60 M.J. 642, 646 (N-M. Ct. Crim. App. 2004).

[50] 10 U.S.C. § 866(d)(1)(B).

[51] *United States v. Harvey*, 83 M.J. 685, 691 (N-M Ct. Crim. App. 2023), *rev. granted*, __ M.J. __, No. 23-0239/NA, 2024 CAAF LEXIS 13 (C.A.A.F. Jan. 10, 2024).

[52] *Id.*

that, when weighed, the evidence (including the testimony) does not support a conviction, we may set it aside."[53]

## B. Analysis

Our superior Court has long afforded military judges the discretion to determine, "in appropriate circumstances," when test results, as explained by expert testimony, permit consideration of a permissive inference that the presence of a controlled substance demonstrates knowledge and wrongful use.[54] This inference "of wrongfulness is a permissive inference or presumption, not a mandatory inference or presumption."[55]

But the lynchpin of the permissive inference has always been scientific and evidentiary reliability.[56] And, as set forth above, the evidentiary deficiencies in the record before us are legion.

Importantly, the Defense challenged the lack of foundation for the chain of custody documents[57] and, when that was unsuccessful, argued the Government had put "all their eggs" in the permissive inference basket, and that errors in the SACO program and at the NDSL did not warrant the permissive inference of wrongfulness in this case.[58] On this point we agree.

Although written in the twilight of the last century, the sagacious words written by Senior Judge Effron in *Campbell* remain true:

> The possibility of a positive result from an error in the test or from unknowing ingestion of a substance that does not trigger any reaction on the part of the servicemember is the worst nightmare of every good servicemember and a cause of serious concern to the judicial system.[59]

And the facts in this case should leave any rational factfinder with reasonable doubt as to whether Appellant wrongfully used MDMA and are indeed of serious concern to this Court.

---

[53] *Id.* at 693.

[54] *Green*, 55 M.J. at 80.

[55] *United States v. Harper*, 22 M.J. 157 (C.M.A. 1986).

[56] *See, e.g., United States v. Campbell*, 50 M.J. 154, 159-60 (C.A.A.F. 1999).

[57] R. at 171-72.

[58] R. at 798.

[59] *Campbell*, 50 M.J. at 160.

The devastating consequences of a criminal conviction for the wrongful use of controlled substances set forth in *Campbell* haven't changed. Nevertheless, the serious threat to military readiness posed by drug abuse permits evidence-gathering techniques and permissive inferences that "'would not pass muster' in the context of a civilian criminal trial."[60] Our superior Court has, therefore, struck a balance "between the Government's need for a flexible, dynamic drug testing program and the interest of members of the armed forces in a program that is administered in a fair and just manner."[61]

But the Sailors and Marines who face the devastating consequences of a criminal conviction while being afforded diminished constitutional protections should expect, and this Court will require, substantial compliance with the Department of the Navy's urinalysis program. That did not happen here.[62]

Further, this case squarely presents the so-called good Marine defense, which can be traced to the 1928 Manual for Courts-Martial.[63] And although this defense was significantly restricted almost a decade ago in light of "presidential and congressional focus on military sexual offenses and their shared view that the 'good soldier' defense is inappropriate in such cases,"[64] in light of the impact of drug abuse on military readiness, it remains relevant to alleged violation of Article 112a, UCMJ, as in this case.[65]

"The well-recognized rationale for admission of evidence of good military character is that it would provide the basis for an inference that an accused was too professional a soldier to have committed offenses which would have

---

[60] *United States v. Campbell*, 52 M.J. 386, 389 (C.A.A.F. 2000)(citing *Campbell*, 50 M.J. at 159); *United States v. Hernandez*, 2023 CCA LEXIS 104, *21 (A.F. Ct. Crim. App. 2023)(Key, J. dissenting)("The notion that such a leap can lead to a criminal conviction without any other evidence seems somewhat foreign outside the military, with the exception of parole revocation proceedings.")(citation omitted).

[61] *Id.* at 389.

[62] We agree with the military judge who expressly found that "the government did not strictly comply with all aspects of the applicable regulations and policies governing how urine samples are to be collected, transmitted and tested." AE XXIX at 3.

[63] MCM, United States (1928 ed.) at ¶ 113b.

[64] *United States v. Evans*, 2017 CCA LEXIS 616, *10 (N-M. Ct. Crim. App. 2017).

[65] *See United States v. Vandelinder*, 20 M.J. 41, 45 (C.M.A. 1985)("[A] person of 'good military character' is less likely to commit offenses which strike at the heart of military discipline and readiness.").

adverse military consequences."[66] And *that* is the only inference warranted by the evidence in this case.

The conclusion of the Government's closing argument bears repeating here:

> Gunnery Sergeant Hirst, he is a rock star. But rock stars, just like everyone else testified to, can do drugs as well. He's a great Marine and great Marines can still commit misconduct.[67]

Experience tells us that rock stars can do drugs. However, we are skeptical of the Government's claim that truly great Marines do the same. But we need not resolve that philosophical debate because we are clearly convinced that Appellant's conviction is against the weight of the evidence.

## III. CONCLUSION

After careful consideration of the record, as well as the briefs of appellate counsel, the findings and sentence are **SET ASIDE the Charge and Specification is DIMISSED WITH PREJUDICE**.[68]

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[66] *United States v. Wilson*, 28 M.J. 48, 49 (C.M.A. 1989).

[67] R. at 780.

[68] Although we resolve this case under our unique power to determine the factual sufficiency of the evidence below, we also agree with Appellant that a sentence of confinement for 90 days for the charged offense is inappropriately severe.